In re Roger E. INDRELAND, Debtor.

Bankruptcy No. 86–20732.

United States Bankruptcy Court,
D. Montana.

Aug. 12, 1987.

Donald MacDonald IV, Missoula, Mont., for debtor.

Christopher B. Swartley, Missoula, Mont., for First Sec. Bank.

Dunlap and Caughlan, Trustee, Butte, Mont.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 12 case, hearing on the Debtor's Plan was held on June 9, 1987, together with objections filed by First Security Bank, the major secured creditor of the Debtor. The Bank challenges the eligibility of the Debtor as a family farmer in the context that even though the Debtor meets the definition of a family farmer at the petition date, under the facts developed at the confirmation hearing, the Debtor's own evidence shows that he will not meet the test throughout the term of the Plan. Under the Plan, the Debtor proposes to surrender to the Bank a portion of his collateral and then restructure the balance of the debt over a term of 30 years at 10½ % interest payable at $15,500.00 per year.[1]

The Debtor in the past has worked as a full time rancher since 1979 on the 2,153 acre ranch that has been in his family for over 40 years. During that period, he borrowed money from First Security Bank of Missoula and the Western Montana Production Credit Association (PCA) to cover operating losses arising out of cattle operations. He also borrowed money from his mother. During the unprecedented low cattle prices of the late 70s and early 80s, he lost substantial sums of money and was eventually forced to liquidate the cattle herd. His present debts include First Security Bank in the sum of $340,000.00 together with accruing interest, costs and attorney's fees, PCA in the amount of $18,000.00; his mother in the amount of $65,000.00 (which sum his mother has now forgiven in a waiver and release filed with the Court); and First Bank Western for the purchase of a Caterpillar and several trucks in the sum of $12,000.00. In addition, $7,000.00 to First Interstate Bank was incurred for the purchase of a portable saw mill. The trucks encumbered to First Bank Western and the Caterpillar are all used in ranching operations, which presently are confined to raising hay and horses.

In 1986, the Debtor earned in excess of 50% of his income from non-farm sources in the form of wages. His 1985 income tax return shows the Debtor's income from farm income was $15,650.00, which, the

---

1. Two additional parcels under the Plan will be sold for cash with the net proceeds paid to the Bank. The Bank has not opposed such provision, and therefore this Order is based on the Bank's consent to those portions of the Plan.

Bank concedes, was over 50% of his total 1985 income. This Chapter 12 case was filed on December 9, 1986, and thus the 1985 tax year is the critical test year from determining eligibility to file a Chapter 12 petition. *In re Pratt*, 78 B.R. 277, 4 Mont.B.R. 402 (Bankr.Mont.1987) (determining eligibility under the gross income test requires a careful review of the debtor's tax and financial records for the prior tax year, by use of the term gross income as defined in the Internal Revenue Code). Considering then, that the Debtor has met the eligibility test of § 101(17), the Bank nevertheless argues that since the Debtor's principal means for execution of the Plan after confirmation is through non-farm income from earnings as an equipment operator, the Debtor thereby loses the benefits of Chapter 12 since he will not be making payments due under the Plan solely from farming operations.

 It is undisputed that the Debtor during the 5 year term of the Plan will earn $30,000.00 to $35,000.00 a year as an equipment operator, while the ranch operation will produce about $15,000.00 annually. The annual payments due under the Plan require over $23,000.00 per year. The Bank thus argues that such is not the type of family operation which Congress had in mind when it passed Chapter 12. It must be noted that the Debtor does intend to continue raising hay and horses on the remaining ranch property, and thus continue on a part-time basis as a farmer. A decision addressing the issue is contained in the case of *In re Tart*, 73 B.R. 78, 81 (Bankr.E.D.N.C.1987), where the Court held:

> "The legislative history of Chapter 12 indicates that its primary purpose is to help family farmers *continue* farming. A conference committee report was prepared which worked out the differences between the versions of Chapter 12 which had been passed by the Senate and the House. * * * That statement declared that Chapter 12 'is designed to give family farmers facing bankruptcy a fighting change to reorganize their debts and keep their land'. Statements by the primary sponsors of Chapter 12 also suggest that its primary purpose is to help family farmers stay in farming * * *. Based on this legislative history and the definition of 'family farmer' as an individual 'engaged in a farming operation', this court holds that the debtors in this case who were, at most, minimally engaged in farming during the taxable year preceding the taxable year in which their petition was filed, who had sold all their farmland prior to the filing of their petition, and who did not intend to resume any farming operation, do not qualify under Chapter 12." (Emphasis in text).

The *Tart* court distinguished the holding of *Potmesil v. Alexandria Production Credit Association*, 42 B.R. 731 (W.D.La.1984), which addressed the question of whether a debtor was a 'farmer' so as to be considered for involuntary bankruptcy under 11 U.S.C. 101(19), by stating:

> "The present case is distinguishable from *Potmesil* because of the differences between Sections 101(17) and 101(19). Section 101(17) states that a 'family farmer' means an individual 'engaged in a farming operation'; no such language is found in the Section 101(19) definition of 'farmer'. The inclusion of this language in § 101(17) suggests that Congress intended to require more than that a 'family farmer' be engaged in a farming operating during the taxable year preceding the year in which the petition was filed. If Congress intended to focus only on this time period, the 'engaged in a farming operation' language would be superfluous since it would appear that an individual who, for the taxable year preceding the year in which the petition is filed, incurred 'at least 80% of his debt and received at least 50% of his income from a farming operation he owned or operated, as required by § 101(17),' would necessarily have been engaged in a farming operation during that same time period. A statute should not be interpreted so as to render one part inoperative, superfluous or insignificant. *In re Gyulafia*, 65 B.R. 913 (Bankr.D.Kan.1986); *In re Brooks*, 51 B.R. 741 (Bankr.S.D.Fla. 1985)." *Id.* at 81.

I concur with the reasoning of the *Tart* case. However, *Tart* also correctly stated that each case must be decided on its own unique facts. I would further note that the Joint Explanatory Statement of the Committee of Conference on H.R. 5316 acknowledges that "family farmers who are eligible for Chapter 12 may be involved in *minor* businesses not directly related to the farming operation" and "the Conference intended that the term 'debtor's business' in Section 1225 include such businesses." (Emphasis in text). What the Committee meant by use of the term "minor" is unexplained, except that the statement is consistent with the purpose of Chapter 12 and its definitions that the thrust of the law is to aid and assist farming operations which are plagued with inherent risks of weather, market conditions and infestations of insects, and thus require outside income to survive.

The case of *In re Mikkelsen Farms, Inc.*, 74 B.R. 280, 285 (Bankr.Or.1987), holds in discussing § 101(18): [2]

"The House Committee on the Judiciary in its report on H.R. 2211, a predecessor to the bill ultimately passed into law, indicates Congress was concerned that the statute allow for the fact a farmer may not receive income on a weekly or monthly basis. H.R.Rep. No. 178, 99th Cong., 1st Sess., reported in Bankr.L. Rep. No. 152 (CCH) (June 27, 1985). It indicated the provisions of § 101(27) defining 'individual with regular income' would apply to Chapter 12 but the regularity of income for farmers should be determined on an annual basis. *Id.* at 6. Although the tone of the report suggests an assumption that any income to fund the plan would be from traditional farm operations based on a seasonal production, there is no statement in the history that it *must* be. Certainly the emphasis in the language and subsequent interpretation of § 101(27) has been on the *regularity* of income available to fund a plan. The *source* of income has been relevant only to the extent it effects its regularity." (Emphasis in text).

*Mikkelsen* concluded that the inclusion of the term "income from farming operations" used in § 101(17), but absent from § 101(18), was deliberate on the part of Congress and thus a family farmer who qualifies under § 101(17) may be a family farmer under § 101(18) if it can be shown that he will have regular annual income from any source.

■ Unlike the facts in *Tart*, the Debtor in this case still owns and manages the ranch, which annually produces hay for sale and on which horses are bred and raised for sale. That operation will continue with the Debtor in control of the farming operation. Forced by economics to sell his cattle operation, the Debtor has now elected to scale down the farm operation, retain just under 2,000 acres as an integrated operation for the production of income. While present plans do not contemplate resumption of a cow-calf operation, with proper farming, the land is suitable for such an operation. The fact outside earnings of the Debtor must now be used as the principal source of payment to creditors does not, in my opinion, destroy his eligibility as a family farmer engaged in a farming operation, for it is likewise true that the farm income is just as necessary to make the Plan feasible as the non-farm income. The broad purpose of Chapter 12—to keep the farmer on the land—is not served by a strict mechanical application of an income test throughout the term of the Plan. Rather, the important inquiry is whether the Debtor can feasibly rehabilitate his farming operation through debt restructure so as to maintain a farming operation. Since the debt which is proposed to be restructured in this case arises solely out of the past farming efforts, and continual operation of that farm operation is an essential part of the Debtor's proposed Plan, I find and conclude that the Debtor is a family farmer engaged in a farming operation and is entitled to the benefits of Chap-

**2.** "(18) 'Family farmer with regular annual income' means a family farmer whose annual income is sufficiently stable and regular to en- able such family farmer to make payments under a plan under Chapter 12 of this title."

ter 12. The Bank's objection on such grounds is therefore rejected.

■ The next issue which must be addressed is the Plan proposal to surrender a parcel of the Bank's collateral to the Bank in partial satisfaction of the Bank's claim. The Debtor has not attempted to utilize the pre-confirmation provisions contained in Section 1206, allowing for sales of portions of the farm property free and clear of liens.[3] Rather, in treatment of the Bank's claim, the Debtor proposes to deed over to the Bank two 160 acre parcels of land located in Section 7, T14N, R19W, M.P.M., and then, after credit of the value of those tracts, pay the remaining balance to the Bank over 30 years at 10½% interest, in equal annual installments. The Bank not only disagrees with the Debtor's valuation of such tracts, but states that such partial transfer of collateral is not authorized under Chapter 12. As explained in *In re Rott,* 73 B.R. 366, 374 (Bankr.N.D.1987):

"While Chapter 11 provides for more liberal treatment of secured creditors' mortgages and liens, *see* 11 U.S.C. § 1129(b)(2)(A) (iii), Section 1225(a)(5)(B)(i) requires that *the* lien be retained, not *a* lien."

Thus, it is argued the entire lien must be preserved in tact, or the entire collateral surrendered in satisfaction of the secured debt. However, Subsection 1222(b)(8) taken from 1123(a)(5)(D) provides:

"(b) Subject to subsection (a) and (c) of this section, a plan may—(8) provide for the sale of all or any part of the property of the estate or the *distribution of* all or *any part of the property* of the estate

among those having an interest in such property." (Emphasis supplied).

Subsection (b)(7) states that a Plan may "(7) provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor" and Section 1225(a)(5)(C) allows confirmation if a plan of the debtor surrenders the property securing a claim to that creditor. Section 1225(a)(5)(C) is taken from § 1325(a)(5)(C). Section 1225(a)(5)(c) facially appears to require a surrender of all of the secured creditor's collateral, but such reading would not comport with § 1222(b)(7) and (8), which allows a surrender of part of the property of the estate in payment of the claim.

As noted above, § 1222(b)(8) was adopted from Chapter 11. Under Chapter 11, a Debtor may substitute collateral so long as the secured creditor receives the indubitable equivalent of his lien. *See,* e.g., *Matter of Sun Country Development, Inc.,* 764 F.2d 406 (5th Cir.1985) [substitution of 21 promissory notes from 21 obligors for the first lien on real property constituted the indubitable equivalent of the first lien and was permitted under 11 U.S.C. § 1129(b)(2)(A)(iii) ]. Further, in Chapter 11, a farmer was permitted to surrender to the secured creditor a portion of the collateral and pay for the remaining retained real property in cash. *In re Fursman Ranch,* 38 B.R. 907 (Bankr.W.D.Mo.1984). Relying on 1129(b)(2)(A), that court held:

"As to the property to be kept by debtor, the creditors will retain their liens. As to the property proposed to be surrendered, the lien will merge into possession by the secured creditor. The balance of

---

**3.** The legislative history on Section 1206 states:
"The second area where our committee heard that farmers need help is in 'sales free of liens'.
After filing for protection under the Bankruptcy Code, the farm debtor soon realizes that he will not be able to keep all of his property. Accordingly, he needs a way to sell assets not needed for the reorganization prior to confirmation, without the consent of the secured creditors, and subject to approval by the court.
Under 11 U.S.C. 363(f) of existing law, a debtor is authorized to sell property of the estate under five conditions. One of these condi-

tions is that the secured creditor consents to the sale. Section 1223 of the Chapter 12 amendment would add a sixth ground for a sale of assets—only to be used in Chapter 12 cases. Under this section, the Trustee will be allowed to sell property, subject to court approval, if it is 'farmland or farm equipment'. As a concomitant protection to creditors, should the farm debtor sell the collateral without applying the proceeds to debts, the debts would not be dischargeable upon confirmation of the plan. See Section 1219 of the Chapter 12 amendment." S.1923, 99th Cong., 2nd Sess., 132 Cong.Rec. S. 5556 (daily ed. May 7, 1986).

the claim will be paid by deferred cash payments at the interest rate previously set by the court. There is no sale proposed. It would appear that the plan proposed to give creditors the indubitable equivalent of their claims.

\* \* \* \* \* \*

The court holds that there is no statutory bar in the Code to the plan proposed here to return part of the collateral and pay for the balance. Cf. Section 1124 of the Code." *Id.* at 908–909.

The *Fursman* court further noted that there was an additional safeguard to the secured creditors upon sale of the surrendered property if they did not produce sales proceeds approximating the value set by the court. *Fursman* noted:

"If a commercially reasonable sale by the creditors does not result in payment approximating the values set here, the creditors may ask for reconsideration of their claims. Cf. *In re Crosthwait*, 34 B.R. 469 (Bankr.W.D.Mo.1983)."

It is to be noted that under § 1225(a)(5), the rights of nonconsenting secured creditors can be modified if the plan provides that the holders of such claim retain *the* lien securing such claim and receives present value of its claim from distribution under the plan, § 1225(a)(5)(B)(i) and (ii), *or* the debtor surrenders *the* property securing the claim to the creditor, 1129(a)(5)(C). Clearly Section 1225(a)(5)(B)(ii) permits payments in kind because that subsection is couched in language which speaks of value distributed under the plan. In contrast, Section 1129(b)(2)(A)(i)(II) requires "the holder of a claim of such class receive on account of such claims deferred cash payments \* \* \*". What Section 1222(a)(5) does not permit is for the debtor to cramdown using sales free and clear of liens with substitute liens or other forms of indubitable equivalents permitted by 1129(b)(2)(A). The matter has been addressed in *In re Massengill*, 73 B.R. 1008 (Bankr.E.D.N.C.1987), a Chapter 12 case involving surrender of Federal Land Bank and PCA stock in partial payment of their secured claims, and sale of part of the land, the latter provision of which was consented

to by the secured creditors. Both secured creditors objected to the reduction of their secured claims by the amount of stock retained by the debtor. *Massengill* states, after finding return of the stock was not prohibited by the Farm Credit Act [12 U.S.C. § 2034(a) ]:

"Chapter 12 is 'designed to give family farmers facing bankruptcy a fighting chance to reorganize their debts and to keep their land'. H.R.Rep. No. 99–958, 99th Cong.2d Sess. 48 (1986), U.S.Code Cong. & Admin.News 1986, pp. 5227, 5249. It is emergency legislation which suspends a number of creditor protections which are available in Chapter 11 to facilitate family farmer reorganization. The essence of Chapter 12 reorganization is the debtor's ability to deal with secured claims. In that regard, the debtor has great flexibility and many options. One method is found in 11 U.S.C. § 1222(b)(8) which states that a Chapter 12 plan may 'provide for sale of all or any part of the property of the estate *or the distribution of all or any part of the property of the estate among those having* an interest in such property' (Emphasis added). Furthermore, surrender of property securing a claim to the holder of the secured claim is specifically recognized in the Chapter 12 confirmation requirements of 11 U.S.C. § 1225(a)(5)(C) as a proper way to treat a secured claim." *Id.* at 1012.

Like the *Massengill* court, I conclude the transfer of property, either in part or in whole to satisfy a secured claim is permitted in Chapter 12, under 1222(b)(7) or (8) and 1225(a)(5)(B) or (C). The limit on the Debtor's right to make such transfers under the Plan is that the value of the property transferred must be equal to the fair market value of the property distributed to the lienholder. Thus, we must now determine the value of the parcels proposed to be transferred under the Plan.

█ One of the Bank's appraisers gave the opinion that the entire ranch of the Debtor had a present maket value of $525,-000.00 to $550,000.00, but he did not break out the acreage on a per acre value. With

regard to the two 160 acre parcels on Section 7, the other Bank appraiser stated the acreage was worth $200.00 per acre, thereby making each tract worth $32,000.00. The Debtor's appraiser fixed the value of each 160 acre tract at $96,000.00, which was arrived at by discounting the fair market value for each tract of $128,000.00 for costs associated with holding the tracts until sale within two years. All parties conceded the highest value for each tract would be based on recreational use due to the amenities of the tracts. I accept the valuation of the tracts fixed by the Debtor's appraiser because the comparable sales he used were more comparable to the subject property and were sales made in 1986 and 1987. The comparable sales by the Bank's appraiser were either misstated, outdated or of parcels which were not comparable in location, size or amenities (such as access and utilities) to the Debtor's property. Therefore, I fix the value of each 160 acre parcel at $96,000.00. I further hold that since the Debtor's appraiser felt the tracts could be marketed within two years, well within the term of the Debtor's 5 year Plan, the Bank, upon sale, may seek redetermination of its claim if the parcels do not bring at fair sale the value fixed by this Order. *In re Fursman*, supra.

The final issue raised by the Bank is the term of repayment. As I understand the latest addendum to the Plan made by the Debtor after the confirmation hearing, the interest rate of 10½% is now acceptable to the Bank, but the term is unacceptable. The only credible evidence in the record on loan term is from the Bank and that evidence, which I accept, is that a term of 30 years on this type of real estate loan is not prevailing in the commercial lending market. *But see, In re O'Farrell*, 74 B.R. 421 (Bankr.N.D.Fla.1987), (loans secured by real estate are frequently made for 30 years). The test to be applied is set forth in *In re Jannsen Charolais Ranch, Inc.*, 73 B.R. 125, 128, 4 Mont.B.R. 290 (Bankr. Mont.1987), and *In re Robinson Ranch*, 75 B.R. 606, 610, 4 Mont.B.R. 414, 418 (Bankr. Mont.1987) where the proper rate of interest and loan term is determined by the prevailing market for the type and quality of the loan at issue. *In re Welco Industries*, 60 B.R. 880, 882, 883 (BAP 9th Cir. 1986). See also, *In re Lewis Industries*, 75 B.R. 862, 4 Mont.B.R. 434, 446-447 (Bankr.Mont.1987). I conclude the term of 30 years is not the prevailing market term of commercial lenders for the type of loan and risk involved in this case. It is incumbent that the Debtor propose a Plan which complies with the provision of Chapter 12, since it is not the duty of the Court to write a plan. *Janssen Charolais Ranch*, supra. The Plan will have to be rejected with leave of the Debtor to propose a loan term compatible with the prevailing market, or present satisfactory credible evidence to support the term of 30 years.

IT IS ORDERED the Debtor's Amended Chapter 12 Plan, as modified on June 9, 1987, is denied confirmation with leave to amend within 14 days.