**In re Larry Gene Chip BUCKINGHAM, and Sheri Darleen Buckingham, a/k/a Sheri Darleen Parrott, Debtors.**

**Bankruptcy No. 95–30659–12.**

United States Bankruptcy Court, D. Montana.

June 3, 1996.

---

R. Clifton Caughron, Caughron & Associates, Helena, Montana, for debtors Buckingham.

Don Torgenrud, St. Ignatius, Montana, for Valley Bank of Hot Springs.

## ORDER

JOHN L. PETERSON, Chief Judge.

In this Chapter 12 bankruptcy, after due notice, confirmation hearing was held May 7, 1996, on Debtors Larry Gene Chip Buckingham's and Sheri Darleen Buckingham's ("the Debtors") Amended Chapter 12 Plan (dated May 3, 1996) at Missoula. The Debtors appeared at the hearing in support of the Plan represented by counsel, as did Valley Bank of Hot Springs ("VBHS") in opposition. The Chapter 12 Trustee was also present. The Debtors presented the testimony of Debtor Larry Gene Chip Buckingham ("Larry"), economist Tim Watts, Greg Tipps, Jerry Hall, Paul Atkins, Clinton Rice, Jr., Clinton Rice, Sr. and Bob Zeigler. The Debtors had Exhibits 1, 2 and 3 admitted into evidence, and VBHS had Exhibits C and D admitted. Upon close of the hearing, the Court took the matter under advisement and granted the parties ten days to submit memoranda of law in support of their respective positions. Such deadlines having now passed and briefs having been filed, the matter stands ripe for decision. VBHS also included in its brief opposing confirmation, a motion to dismiss. Upon review of the record, the Court sustains the objections of VBHS, and denies confirmation of the Amended Chapter 12 Plan.

The dispositive issues involve whether the Debtors engage in a "farming operation" as defined under 11 U.S.C. § 101(21), and whether the Amended Plan has been proposed in good faith under 11 U.S.C. § 1225(3). The Debtors claim that although virtually all of the income funding their Plan will come from non-farm employment in the construction field, the majority of their income in the year prior to their filing derived from farming and that they intend to rebuild their former hog operation into a sheep ranch as quickly as they can generate excess income over the contemplated Plan payments

to purchase necessary livestock. They maintain that Larry intends to cease all construction employment as soon as they have the financial wherewithal to sustain their farm, and to specialize solely in the production of sheep at that time. Moreover, they contend that they have a farm operation currently within the meaning of the Bankruptcy Code because they will derive some of their income from rental of summer pasture and from Larry's employment green-breaking young, untrained horses. Thus they argue they indeed have a farm operation.

VBHS resists this contention, alleging that the Debtors do not qualify as family farmers by either the letter or the spirit of Chapter 12 of the Bankruptcy Code. VBHS points out the risks of market fluctuation, crop failure, insect infestation and weather related disaster support the policy of Chapter 12 protection. It also contends that not enough of the Debtors' income is subject to the inherent risks of farming to say they engage in a "farming operation." Therefore, VBHS concludes, absent such risks in a petitioner's income, the special provisions of Chapter 12 should not apply.

Regarding the good faith proposal of the Debtors' Plan, VBHS claims its treatment as an alleged, but not judicially determined tort feasor unfairly discriminates against VBHS, and therefore not only violates 11 U..S.C. § 1222(b)(1), but also § 1225(a)(3) as being proposed in bad faith to thwart the claims of the Debtors' chief creditor. Furthermore, the Court has an independent duty to inquire into the issue of the Debtors' bad faith. *See Fidelity & Casualty Company of New York v. Warren (In re Warren)*, 89 B.R. 87, 90 (9th Cir. BAP 1988) (holding court has independent duty to inquire into bad faith under 11 U.S.C. 1325(a)(3)).

## I.

At the outset, the Court finds that in the period prior to the filing of this petition, the Debtors ran a hog farm, which failed chiefly due to disease in the herd. Prior to the confirmation hearing, however, the Debtors surrendered pursuant to an order granting modification of stay, all of the animals and equipment used in the operation to the secured creditor and thereby abandoned all of their farming operations.

The Debtors filed four different plans of reorganization in this case. Under the current version, the Debtors intend to occupy a 123 acre rural property, which they co-own with a nonpetitioning codebtor, Donna Buckingham (Larry's mother). In their Amended Plan, dated May 3, 1996, the Debtors propose to retire 100% of the $60,000 secured claim owing on the acreage. The express terms of the contract for deed from which the debt arises lists both the Debtors, Larry Buckingham and Sheri Buckingham, and Donna Buckingham as joint tenants with rights of survivorship, referring to all three of them as "Buyers." (See the allowed Proof of Claim of Ivan Cook, filed May 24, 1995). Thus, the contract for deed is the joint obligation of not only the Debtors, but of Donna Buckingham as well. The Plan as proposed, however, will pay not only claims against the Debtors, but also that portion of the secured obligation owed by a nonpetitioning third party, Donna Buckingham. In other words, after the Debtors emerge from their reorganization, Donna Buckingham will own one-third interest in the land paid for under the terms of the Plan, without having contributed anything at all toward the payments under such Plan. Meanwhile, the Debtors' unsecured creditors will receive only $4,810 on claims of $25,977, and then only after the secured claims are paid, which include—once again—a substantial obligation of a codebtor not a party to the instant bankruptcy.

The Debtors attempt to dispute the implications of the contract for deed in their post hearing memorandum, asserting that Donna Buckingham has already paid her share under the contract, and that she will not therefore benefit from paying the balance owed. Nevertheless, such facts were never produced at hearing, and the raw assertions of counsel do not suffice as evidence.[1] Fur-

---

1. "It is well settled that the arguments of counsel are not evidence." *Republic Health Corporation v. Coral Gables, Ltd. (In re REPH Acquisition Company)*, 134 B.R. 194, 206 (N.D.Tex.1991); *In*

thermore, review of the record reveals absolutely nothing to support their position, or to contradict the express terms of the contract for deed. Indeed, the Debtors have not objected to the Proof of Claim supported by the contract and therefore the secured claim constitutes prima facie evidence as to its validity and amount. *See* 11 U.S.C. § 502(a); F.R.B.P. 3001(f).

Virtually all of the income to support the Debtors' Plan will come from Larry's employment as a contract house framer and drywaller. In testimony Larry admitted "with the new plan we filed, we'll be surrendering all our sheep," which they had earlier asserted would support their description as engaged in a "farming operation." This move leaves the Debtors with no commercial livestock. Nor do they contemplate cultivating their realty to raise crops. Thus, by their own admission, none of their income will derive from "farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, [or] production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(21) (defining "farming operation").

The Debtors claim to have specific plans to rebuild a sheep herd from scratch. Yet, even with the rosy income scenario painted by their Plan, which purports to leave them with a $10,000 per year surplus after May of 1997,[2] they have included no projections or itemized plans as to how they intend to achieve this goal. Thus, without forecasts for numbers of sheep to be purchased, their costs, need for and costs of real improvements, feed costs and the like, the Court can only view the Debtors' "plans" as pure speculation. Furthermore, the Debtors claim to meet the prior year income requirements for family farmer status based on income from a *hog* farm. They have failed to explain why they intend to switch from hogs to sheep. Their purported intent, without elaboration, to change the entire nature of their former operation further undermines the credibility

of their future sheep ranching plans. Thus, the Court finds the Debtors lack a realistic intention or capacity to initiate a sheep operation in the foreseeable future.

The Debtors also claim they will garner minor income from two agriculture related sources. First, during the summer season, they hope to rent their pasturage to neighboring cowmen for fixed grazing fees. On cross-examination, Larry made a special point to emphasize the fees due on this grass will not depend on the state of the beef or heifer markets. The Debtors, however, have yet to execute any contracts in consummation of these plans, and they cannot accurately estimate the numbers of cattle to be grazed, the income they expect to receive therefrom, or even if they will ever secure such contracts.

Second, in addition to the estimated 170 hours a week Larry hopes to work in the construction trades, Bob Ziegler, a neighbor, plans to employ Larry breaking untrained horses to ride. Ziegler buys two to four year old "colts" that he knows little about, "whether they have been started or what," and takes them to Larry who "tries them out." Once Larry gets the animals green-broke (which he boasts takes as little as two days, even for a "bad horse") Ziegler sells them. In exchange for his riding services, Ziegler gives Larry 60% of the net on the sale of the horses, after the covering costs of purchase, shipping and feed. Thus, Larry's income derived from the venture depends on the vagaries of the saddle-horse market. Although he has yet to train a single horse this year, Larry estimates he will earn some $4,000 over the next two years from this source of employment. Thus, at best, the Debtors' own estimates project only 6 percent ($4,000/$70,484) of their income arising from agriculture related activities.

## II.

### A.

■ Debtors seeking reorganization under Chapter 12 of the Bankruptcy Code have the

---

re Jr. *Food Mart of Arkansas, Inc.,* 144 B.R. 423, 424 (Bankr.E.D.Ark.1992); *Truswal Systems Corp. v. Hydro–Air Engineering, Inc.,* 813 F.2d 1207, 1211 (Fed.Cir.1987).

**2.** The Debtors' Schedule J indicates living expenses for a family of five at $1,159 per month.

Under their Plan, they will pay annually to the Trustee $12,655, for total annual expenses of $26,563. They project $36,560 in income for the 12 months from April 1997 to May of 1998.

burden of establishing their plans comply with the statutory requirements of confirmation. *Accord, In re Garako Farms, Inc.,* 98 B.R. 506, 509 (Bankr.E.D.Cal.1988). "Only a family farmer with regular income may be a debtor under Chapter 12 of this title." 11 U.S.C. § 109(f). " '[F]amily farmer' means— individual or individual and spouse engaged in a farming operation...." 11 U.S.C. § 101(18). " '[F]arming operation' includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, [or] production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(21). In this case, the threshold question in determining whether the Debtors qualify for Chapter 12 relief is whether they are "engaged in a farming operation." 11 U.S.C. § 101(18).

For the purposes of 11 U.S.C. § 101(21), "[a]lthough certain modes of farming are specified, the definition of 'farming operation' is not limited to those operations specifically enumerated." *In re Borg,* 4 Mont.B.R. 178, 180 (Bankr.Mont.1987). The Eleventh Circuit Court of Appeals has also held the examples of farming operations listed under § 101(21) "are not exclusive ... of other activities that might constitute 'farming operations.' " *Federal Land Bank of Columbia v. McNeal (In re McNeal ),* 848 F.2d 170 (11th Cir.1988) (holding that a chicken coop cleaning and fertilizer business did not constitute a farming operation); *In re Dakota Lay'd Eggs,* 57 B.R. 648, 653 (Bankr.D.N.D. 1986). Moreover, courts must construe this definition "liberally in order to further Congress' purpose of helping family farmers to *continue* farming." *Watford v. Federal Land Bank of Columbia (In re Watford ),* 898 F.2d 1525, 1527 (11th Cir.1990) (finding stone-crabbing business not to be farming operation) (emphasis added). Likewise, in addressing the definition of a family farmer, this Court has held that "help[ing] 'family farmers *continue* farming' " served as the primary purpose behind Congress' adoption of Chapter 12 (emphasis in original). *In re Indreland,* 77 B.R. 268, 270 (Bankr.D.Mont. 1987) (quoting with approval *In re Tart,* 73 B.R. 78, 81 (Bankr.E.D.N.C.1987)). Finally, "each case must be decided on its own unique facts." *Id.*

When inquiring what else might comprise a farming operation, the court in *McNeal* identified two tests to determine whether a particular activity should be treated as a farming operation sufficient to qualify the farmer for Chapter 12 reorganization. *McNeal,* 848 F.2d at 170. First, the court held the "cyclical nature of [a farmer's] business" supports the special provisions contained in Chapter 12 of the Code. "This rationale is steeped in the concept of risk" (citing *In re Armstrong,* 812 F.2d 1024, 1027 (7th Cir.1987)). "[In determining whether an activity is an farming operation w]e consider, therefore, whether [a debtor's purported farming] activities ... were exposed to the inherent risks and cyclical uncertainties traditionally associated with farming." *McNeal,* 848 F.2d at 170. The Court held that the debtor's chicken coop cleaning and fertilizer sales business did not suffer the risks typical of farming activities because the debtor charged a fee up front for the sale of his guano that did not depend on whether his clients' crops came-in.

Second, the activity must not only be a farming activity, but it must also be one related to the debtor's own farming operation and not just "the farming operations of others." *Id.* at 171. The court held that the debtor's coop cleaning services, while perhaps a typical farming activity, did not relate to a farming operation of the debtor. Rather, the court reasoned, the service related to the farming operations of the debtor's clients, and therefore did not qualify the debtor for Chapter 12 relief. *Id.*

A bankruptcy court in the Ninth Circuit has compiled other cases and criteria for identifying a petitioner eligible for Chapter 12 relief:

1. Whether the location of the operation would be considered a traditional farm,

2. The nature of the enterprise at the location,

3. The type of product and its eventual market, although the "... court should not be limited to products and produce which are traditionally associated with farming in the state of the court's loca-

tion ..." Debtors "... should not be denied the protection of the Bankruptcy Code merely because their endeavors are not found in the laundry list of Old McDonald's Farm."

4. The physical presence or absence of family members on the farm,

5. Ownership of traditional farm assets,

6. Whether the debtor is involved in the process of growing or developing crops or livestock, and

7. Perhaps the key factor is whether or not the practice or operation is subject to the inherent risks of farming.

*In re Sugar Pine Ranch,* 100 B.R. 28, 31 (Bankr.D.Or.1989) (citations omitted).

■ As to the timing of when a petitioner must be "engaged in a farming operation" to qualify for Chapter 12 reorganization, this Court in *Indreland,* 77 B.R. at 270, quoted with approval the following language from *Potmesil v. Alexandria Production Credit Association,* 42 B.R. 731 (W.D.La.1984):

Section 101[(18)] states that a 'family farmer' means an individual 'engaged in a farming operation'; no such language is found in the Section 101 [(20)] definition of 'farmer'. The inclusion of this language in § 101[(18)] suggests that Congress intended to require more than that a 'family farmer' be engaged in a farming operation during the taxable year preceding the year in which the petition was filed. If Congress intended to focus only on this time period, the 'engaged in a farming operation' language would be superfluous since it would appear that an individual who, for the taxable year preceding the year in which the petition is filed, incurred 'at least 80% of his debt and received at least 50% of his income from a farming operation he owned or operated, as required by § 101[(18)],' would necessarily have been engaged in a farming operation during that same time period. A statute should not be interpreted so as to render one part inoperative, superfluous or insignificant. (Citations omitted).

Thus, the holding of *Indreland* entails the proposition that to reorganize under Chapter 12 of the Code, a petitioner must engage in at least some farming operations over the entire duration of the plan, even if on a cyclical or reduced scale basis.

**B.**

**1.**

■ The Bankruptcy Code provides for the treatment of codebtors at 11 U.S.C. §§ 501, 502 and 509. First, nonpetitioning codebtors, sureties, or others "liable to the same [parties] for the same [amount] to be paid out in the same way" as the petitioning debtor may have rights against the petitioning debtor as subrogees to the claims of the creditor, at least to the extent that have paid the creditor. 11 U.S.C. § 509; *In re White Motor Corp.,* 731 F.2d 372, 374 (6th Cir. 1984). Subrogation does not result, however, if the codebtor has made no payment to the creditor. 11 U.S.C. § 509(a); *see, also, In re Trasks' Charolais,* 84 B.R. 646 (Bankr.D.S.D. 1988). Moreover, if payment did occur, subrogation does not take place where the codebtor received the consideration for the claim of the creditor. 11 U.S.C. § 509(b)(2).

■ In the alternative, a codebtor may assert a proof of claim under 11 U.S.C. § 501 for any funds paid on behalf of a petitioning debtor. Note, however, that filing under § 509 precludes a claim filed under § 501. 11 U.S.C. § 502(e). This allows the codebtor a choice of filing in its own name if its claim enjoys secured status, or to subrogate to the claim of the original creditor if only the creditor's claim is secured. Lawrence P. King, 3 *Collier on Bankruptcy* ¶ 502.05[1] (15th Ed.).

■ Nevertheless, in neither event does the Code provide for payments on the co-obligations of nonpetitioning codebtors where no evidence exists, in the form of a proof of claim or otherwise, that the codebtor has made any payments on behalf of the petitioning debtor—especially where partial title in property securing the claim vests in the non-debtor upon completion of the plan. Such situation would allow for the payment under a plan of reorganization of secured debts of non-petitioning codebtors to the detriment of unsecured creditors of the estate. That is exactly the end result of the Debtors'

Amended Plan. The provisions and policy of the Bankruptcy Code, however, do not permit such an unfair result.

**2.**

Section 1208(c) governs involuntary dismissal of a Chapter 12 case. The statute provides in relevant part:

(c) On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter for cause, including—

\* \* \* \* \* \*

(5) denial of confirmation of a plan under section 1225 of this title and denial of a request made for additional time for filing another plan or a modification of a plan; ...

or

(9) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation.

Confirmation may be denied if a Chapter 12 plan does not comply with provisions of Chapter 12 or other applicable sections of the Code or has not "been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1225(a)(1) and (3).

The Bankruptcy Appellate Panel of the Ninth Circuit adopted the following "good faith" standard in *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. BAP 1983):

Whether it [good faith] exists in any case depends upon the facts and circumstances presented. No one evidentiary fact can be given paramount weight in deciding the question. If it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities, good faith does not exist. But if it is apparent that the purpose is not to delay or defeat creditors but rather to put an end to long delays, administration expenses ... to mortgage foreclosures, and to invoke the operation of the [bankruptcy law] in the spirit indicated by Congress in the legislation, namely, to attempt to effect a speedy efficient reorganization upon a feasible basis ... Good faith cannot be denied.

This Court followed *Thirtieth Place* in *In re Borg*, 105 B.R. 56, 57 (Bankr.D.Mont.1989).

Furthermore, Chapter 13 statutory construction and practice "provide a valuable tool for interpretation of Chapter 12." *In re Janssen Charolais Ranch, Inc.*, 73 B.R. 125, 126 (Bankr.D.Mont.1987); *see, also, In re Schneekloth*, 186 B.R. 713, 715 (Bankr. D.Mont.1995); *Traders State Bank of Poplar v. Mann Farms, Inc. (In re Mann Farms, Inc.)*, 917 F.2d 1210, 1214 (9th Cir.1990) (cases considering the "good faith" requirement under both Chapters 11 and 13 are instructive and equally relevant in determining "good faith" under § 1225(a)(3)). On the issue of bad faith in filing a Chapter 12 plan of reorganization, the following Chapter 13 analysis yields pertinent instruction:

Bankruptcy courts also have "an independent duty to make a considered assessment of the debtor's good faith." *Warren*, 89 B.R. at 90.

If confirmation depended entirely upon arithmetical computations or the absence of illegal activity in the case, there would be no need for a judge. Confirmation of a Chapter 13 plan requires the exercise of judicial discretion and assessment of evidence by a bankruptcy judge. The good faith requirement is one of the central, perhaps the most important confirmation finding to be made by the court in any Chapter 13 case. Each case must be judged on its own facts.

*Id.* In appraising the issue of a debtor's good faith, the Ninth Circuit Bankruptcy Appellate Panel ("BAP") has also held:

In general the court must focus on the equity and good conscience of the debtor. The court must be guided by equitable doctrines and must consider such things as the public interest. [citing *American United Mutual Ins. Co. v. City of Avon Park*, 311 U.S. 138, 140, 61 S.Ct. 157, 159, 85 L.Ed. 91 (1940).] Specifically, with respect to Chapter 13 the court must inquire into whether the debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable man-

ner. While substantial repayment is a factor, the court must consider all other factors that relate to the equities, and the decision must be made on a case by case basis.

*Street v. Lawson (In re Street)*, 55 B.R. 763, 764 (9th Cir. BAP 1985) (citing *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1389–90 (9th Cir.1982)). "Though it may consider the substantiality of the proposed repayment, the court must make its good-faith determination in the light of *all* militating factors." *Goeb*, 675 F.2d at 1390 (emphasis in original).

*In re Pickering*, 195 B.R. 759 (Bankr. D.Mont.1996).

### III.

■ Applying the foregoing principles to the unique facts and circumstances of the case at bar, the Court finds the Debtors have failed to carry the burden of showing themselves to be engaged in farming operations during the term of the Plan. They therefore do not qualify for relief under Chapter 12 of the Bankruptcy Code. Combined with their proposal to improperly pay the obligations of a codebtor through payments under their Plan, this leads the Court to further conclude that they have proposed their Amended Chapter 12 Plan in an manner sufficiently inequitable to warrant dismissal of the instant petition. As stated in *Mann Farms*, 917 F.2d at 1214, describing § 1225(a)(3), "[T]he court reviews the plan for "fundamental fairness in dealing with one's creditors, . . ."

### A.

■ Under *McNeal*, 848 F.2d at 170, an individual who performs farm services for others does not qualify as a farmer, because those services do not face the risks associated with farming, and because those services do not relate to the performer's own farm. In *McNeal*, the debtor owned no livestock and cultivated no soil. Rather, the debtor cleaned chicken guano from coops for no fee, and sold the substance as fertilizer. The debtor argued that since the services obviously were of a type typically performed on a farm, and that he performed them on farms,

and sold his products to farmers, his income derived from a farming operation.

The Court disagreed, finding that the success of the service did not face the risks of failure due to weather, disease or parasite typically associated with farming. Consequently, the economics of the debtor's "cash-up-front" enterprise did not compare to the "cyclical nature of [a farmer's] business" for which Congress designed "the special protections that the Bankruptcy Code." *Id.* Moreover, the court held, even if the debtor's services resembled closely farm activities taking place on area chicken farms, debtor performed those services in connection with the farm operations of others, not his own. *Id.* at 171. This distinction also led the court to conclude that "the mere purchase and sale of farm by-products is not necessarily a 'farming operation.'" *Id.*

■ Similarly in the case at bar, the Debtors' grazing fee income does not depend on cattle market conditions. Under the terms of their proposed grazing contracts, the fixed fee accrues to them regardless of the eventual sale price of the cattle boarded there. When the grazing season ends, the pre-agreed fee simply becomes due. Moreover, to extent that allowing cattle to graze resembles a farm operation, the activities arise not from the farm operations of the Debtors, but from the farm operations of others. So too, with the horse-breaking service Larry will provide Bob Ziegler. While the income from the service may depend on the conditions of the saddle horse market, and other risks associated with livestock husbandry, the service is provided in connection with another's farming operation. Further, even assuming that this minimal part of the Debtors' income could be said to derive from farming, the insignificant level of the venture when compared with the vast bulk of the Debtors' activities, precludes treatment of the Debtors' endeavors as "farming operations."

■ In addition, the facts of this case satisfy only three of the seven *Sugar Pine Ranch* criteria. While the location and nature of the Debtors' operation as well as the presence of family members on the property

would make it a "traditional farm," the Debtors (1) produce no product, (2) they own no "traditional farm asset" such as farm implements, livestock, etc., other than the land itself, (3) they involve themselves almost entirely with tasks other than "the process of growing or developing crops or livestock," and (4) "perhaps the key factor," their income is not subject to the "inherent risks of farming." *Sugar Pine Ranch,* 100 B.R. at 31.

The Debtors rely heavily in their brief on comparison with the facts in this case with those in *Indreland,* 77 B.R. at 268, in which this Court held that whether a petitioner qualifies as a family farmer depends on a totality of the unique facts and circumstances of the case. *Id.* at 271. In *Indreland,* a rancher who had run an extensive cow-calf operation fell into insolvency upon a collapse in beef prices. To rehabilitate the ·farm, the debtor proposed to raise hay and horses on the lands, while spending the bulk of his work effort employed in the construction trades. The plan contemplated at least a full 30% and up to one-third of the debtor's income would derive from the hay crop and horse herd. The court found these efforts sufficient to entail a farming operation because the debtor's ranch would continue to annually produced "hay for sale" and breed and raise "horses for sale."

In the Debtors' case, the Debtors' efforts produce neither crops nor commercial livestock, for sale or otherwise, now or in the foreseeable future. Although the Debtors purport to intend to eventually buy sheep with which to stock their land, they have provided no details whatsoever as to how they hope to achieve this end. Moreover, the Debtors seek to characterize contracts for grazing fees as "the same thing as selling grass." Nevertheless, the Debtors need only allow the rain to fall and the sun to shine in order to "produce" their grass— which is not harvested as hay, but merely becomes summer forage. Such efforts do not entail farming. Currently, the Debtors' own rosy estimates project only $2,000.00 per year income from Larry's breaking of his neighbor's horses, and no estimates at all from grazing fees on their small acreage.

This accounts for less than six percent of their total income per year. Such an inconsequential figure compares poorly with the estimated one-third of total income from farming provided for in the *Indreland* plan. Furthermore, Larry's horse training efforts resemble more nearly contract or wage labor than did the debtor's in *Indreland.* In that case, the debtor proposed maintaining full control of the farming operation, relying on no one else for management decision-making. Here, Larry will serve as a mere farmhand in Ziegler's horse venture, with no unilateral decision-making authority. Moreover, the horse-breaking could clearly be conducted on Zeigler's property, as opposed to using the Debtors' land.

This Court noted in *Indreland* that the legislative history of the statute indicates " 'family farmers who are eligible for Chapter 12 may be involved in *minor* businesses not directly related to the farming operation.' " *Indreland,* 77 B.R. at 271 (quoting from the Joint Explanatory Statement of the Committee of Conference on H.R. 5316, emphasis in text of report). The Court further commented, "the thrust of the law is to aid and assist farming operations which are plagued with inherent risks of weather, market conditions and infestations of insects, and thus require outside income to survive." The opinion then cited *In re Mikkelsen Farms, Inc.,* 74 B.R. 280, 285 (Bankr.D.Or.1987) for the proposition that earning minor nonfarm income comports with the often seasonal nature of the farmer's occupation, allowing farmers to work at other part-time trades during winter or other off-seasonal periods to supplement their daily living expenses.

Yet, this simply is not what the Debtors propose. By the date of the confirmation hearing, the Debtors had surrendered and abandoned their farm operation. The activities that they attempt to compare to farming operations, even if viewed in the light they advocate, could at the very best be described as insignificant when compared with income the Debtors will receive from Larry's employment in the construction trades. Certainly, such minor income could never finance the Chapter 12 Plan. Thus, the Debtors' Amended Plan attempts to turn

the purpose of Chapter 12 on its head. Congress never intended the provisions of such to allow for "minor farming operations not related to the debtor's businesses." *Indreland,* 77 B.R. at 271.

Moreover, rather than provide detail of their future sheep buying plans, the Debtors have left their designs to speculation, which the Court declines to engage in. Even were such speculation proper, however, under the figures contained in the record, it appears the Debtors cannot afford to purchase sheep until 1998 at very best. Thus, even in the most optimistic case, they will not be engaged in even their "planned" sheep operation for the first two years of the Plan. Thus, the facts and circumstances of this case vary greatly with those in *Indreland,* in which the debtor had crops in the field and horses at pasture at the very date of confirmation. In addition, the *Indreland* analysis indicates that a petitioner must continue a farm operation at some level over the entire duration of the Plan to qualify for Chapter 12. The Court finds the Debtors' current inconsequential income generating activities they engage in on their rural property do not rise to the level of "farming operations" sufficient for them to satisfy the definition of "family farmers" under the Bankruptcy Code. In sum, the Debtors are not now farming, and they do not have any realistic or concrete prospects to *continue* farming over the duration of their Plan.

### B.

On the issue of bad faith, the Debtors' codebtor has not followed the provisions of 11 U.S.C. §§ 501 or 509 for treatment of any claims Donna Buckingham may or may not have against the Debtors. Instead, the Debtors have attempted to satisfy this potential claim by providing for payment under the Amended Plan of 100% of the amounts due on the contract, which upon completion of the Plan will yield a one-third ownership interest in the nonpetitioning codebtor. Yet, the codebtor contributes no payments to the Plan, and the fact that under these terms, secured obligations of the *nonpetitioning* codebtor will be paid before and instead of the *Debtors'* unsecured creditors. In effect, the Debtors' unsecured creditors must forego satisfaction in order to pay-off the obligations on a nonpetitioning third party.

The Court views this scheme as an attempt to unfairly manipulate the Bankruptcy Code. The purpose of this Chapter 12 Plan is to defeat the claims of unsecured creditors in favor of Larry Buckingham's mother.

Such efforts suggest strongly that the Debtors proposed their Plan without a good faith basis. They have either, at best, failed to exercise due diligence in thinking their amended Plan through, or, at worst, have deliberately proposed their Plan with the improper intent of confounding the legitimate claims of creditors. These findings of fundamental unfairness to creditors, combined with the militating factor that the debtors fall woefully short of qualifying as family farmers, imply the Debtors' Plan lacks a good faith basis. *Mann Farms,* 917 F.2d at 1214. Such findings also, therefore, preclude confirmation of the Plan pursuant to 11 U.S.C. § 1225(a)(3), and further, warrant dismissal of this case pursuant to 11 U.S.C. § 1208(c)(5). Finally, the Debtors' numerous missteps requiring the filing of multiple Plans and Amended Plans reveal a state of affairs in which no reasonable likelihood for rehabilitation of the Debtors' financial situation appears to remain. Grounds therefore exist for dismissal of this case under 11 U.S.C. § 1208(c)(9) as well.

Rather than family farmers, the Debtors are individuals with regular income who seek to take advantage of the provisions of Chapter 12 reorganization, which offer them at least two distinct advantages to those under Chapter 13. First, under the restrictive time constraints of Chapter 13, the Debtors lack sufficient disposable income to successfully adjust their secured debts and maintain their interests in their real property. Under 11 U.S.C. § 1322(d), a plan "may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than five years." *Barnes v. Barnes (In re Barnes),* 32 F.3d 405, 408 (9th Cir.1994). On the other hand, Chapter 12 allows for secured debt reorganization to occur over a much longer

time frame. 11 U.S.C. § 1222(b)(9). Thus only in Chapter 12 do the Debtors have sufficient disposable income to keep their land. Indeed, the Debtors propose paying the secured claims over a 20 year period.

Second, the Debtors have as an alleged asset, a lender liability cause of action against VBHS, which is currently pending in a state district court. If their Plan were confirmed, the Debtors would maintain powers to decline or accept proposed settlement offers, *Hoeger v. Tiegen (In re Tiegen)*, 123 B.R. 887 (Bankr.D.Mont.1991), unless the creditors could meet the difficult standard for their removal as debtors-in-possession pursuant to 11 U.S.C. § 1204(a). *In re Myers*, 12 Mont.B.R. 3, 4–5 (Bankr.D.Mont. 1993). On the other hand, in Chapter 13, the Chapter 13 Trustee has the sole authority to settle any pending law suits. If VBHS makes an offer to settle the case, and the Trustee chooses to accept, the Debtors would have no choice but to acquiesce. Thus, in Chapter 12, the Debtors would have a great deal more control over the conduct of and settlement of this case than they would in Chapter 13. Compare 11 U.S.C. § 1204 with § 1303.

### *CONCLUSION*

Considering the totality of unique facts and circumstances in the case at bar, the Court finds the Debtors are not currently engaged in a farm operation, and they do not have the capacity to engage in a farming operation over the life of their Amended Plan. Consequently, they do not meet the criteria set forth under 11 U.S.C. § 101(18) for family farmers and therefore do not qualify for Chapter 12 relief. Furthermore, the Debtors seek to unfairly manipulate the Bankruptcy Code in an effort to benefit a nonpetitioning codebtor at the expense of the Debtors' unsecured creditors. Thus, the Court finds the Debtors have failed to file a Chapter 12 Plan in good faith. For the foregoing reasons the Debtors' Amended Chapter 12 Plan fails to meet the requirements for confirmation of 11 U.S.C. § 1225(a)(3). Finally, the evidence of bad faith in this case warrants dismissal of the

case pursuant to 11 U.S.C. §§ 1225(a)(3), 1208(c)(5) and 1208(c)(9).

IT IS ORDERED confirmation of the Debtors' Amended Chapter 12 Plan filed May 6, 1996, is denied.

IT IS FURTHER ORDERED Valley Bank of Hot Springs' Motion to Dismiss filed May 20, 1996, is granted; and this case is dismissed.