**In re Dennis James CLARK, Debtor.**

**No. 01–13251.**

United States Bankruptcy Court, D. Kansas.

Jan. 22, 2003.

---

W. Thomas Gilman, Wichita, KS, for Debtor.

Eric C. Rajala, Overland Park, KS, trustee.

***ORDER ON CONFIRMATION OF DEBTOR'S THIRD–AMENDED CHAPTER 12 PLAN AND BANK'S MOTION FOR MODIFICATION OF STAY***

ROBERT E. NUGENT, Chief Judge.

On January 8, 2003, this matter came on for confirmation hearing of Chapter 12 debtor Dennis James Clark's ("debtor")

third-amended plan of reorganization[1] as well as on Kearny County Bank's ("Bank") Motion for Modification of Stay[2]. The debtor appeared in person and by counsel W. Thomas Gilman. The Bank appeared by its Vice–President, Gary Beymer, and its counsel Charles F. Harris. The Bank objects to confirmation and opposes the plan on the following grounds: (1) debtor's eligibility for chapter 12; (2) a fixed 6% rate of interest; (3) feasibility; and (4) failure of the plan to provide for retention of the Bank's lien as required by 11 U.S.C. § 1225(a)(5)(B). The Court received into evidence by stipulation of the parties, debtor's exhibits 1 through 8 and the Bank's exhibits A through G and heard testimony from the debtor and Gary Beymer. At the close of the evidence and argument, the Court took the matter under advisement and is now prepared to rule.

### FINDINGS OF FACT

#### Background and Procedural History

Debtor filed for Chapter 12 bankruptcy relief on July 5, 2001. The debtor is indebted to the Bank on three loans in the principal amounts of $150,000 (the real estate note), $60,000 (the equipment note); and $40,000 (the combine note). The real estate note and the equipment note contain a variable rate of interest while the combine note is a short term fixed rate note. The notes are cross-collateralized. The Bank has a lien in debtor's real estate, farm equipment and machinery, vehicles and an oil and gas royalty interest. The Bank filed its proof of claim on July 17,

1. Dkt. 125.

2. Dkt. 94.

3. *See* Dkt. 75.

4. *See* Dkt. 75. The Court's valuations of the collateral were as follows: real estate—

2001 in the amount of $258,661. Other than a small adequate protection payment made by the debtor in December of 2002, the last payment made by debtor to the Bank on his loans was in 1999.

The debtor is 57 years old and has farmed most of his life. The debtor's dryland farming operation consists of wheat and milo crops and CRP. The debtor owns two quarter sections of farm ground and leases the remaining acreage for his farming operation.

The debtor filed his initial plan of reorganization on October 25, 2001. The Bank objected to the plan on a number of grounds, including feasibility and valuation. A confirmation hearing was held on February 26, 2002 and on March 8, 2002 the Court entered an Order Denying Confirmation of Debtor's Chapter 12 Plan ("March Order").[3] At the first confirmation hearing, the Court also made a determination of the value of the Bank's collateral pursuant to 11 U.S.C. § 506(a). The Court found that the total amount of the Bank's allowed secured claim was $244,035.[4] The Court denied confirmation on the basis that debtor's plan, which proposed to sever the Bank's cross-collateralized liens, did not satisfy the lien retention requirement in § 1225(a)(5)(B)(ii). The plan was not feasible because of the increased value of the debtor's real property and the lack of support for debtor's projected farm income. The Court granted debtor additional time to amend his Plan.

On March 28, 2002, the debtor filed his amended Chapter 12 plan ("First Amend-

$170,000; equipment and machinery— $41,900; vehicles—$16,050; and oil and gas royalty interest—$11,085. Since the Bank's proof of claim was in the amount of $258,661, these valuations result in the Bank becoming an undersecured creditor.

ed Plan").[5] In preparing this plan, debtor relied upon the values set by the Court in the March Order. The Bank again objected to the plan on the grounds of feasibility. A confirmation hearing on debtor's First Amended Plan was eventually scheduled for December 3, 2002. On the eve of the confirmation hearing, the debtor filed a pleading titled "Debtor's Trial Brief in Support of Confirmation of Debtor's First Amended Plan as Amended" that set forth a further amendment of the First Amended Plan.[6] Due to snow and ice conditions on December 3, the debtor was unable to appear for the confirmation hearing and the confirmation hearing was rescheduled to January 8, 2003. On January 6, 2003, the debtor filed yet another pleading titled "Debtor's Trial Brief in Support of Confirmation of Debtor's Second Amended Plan, as Amended," purporting to amend his Chapter 12 plan for a third time.[7] This document will be referred to as the Debtor's Third Amended Chapter 12 Plan of Reorganization (hereafter the "Plan") and is the Plan before the Court today.

*Debtor's Third–Amended Plan of Reorganization and Cash–Flow Projections*

The Plan before the Court today is considerably different from prior efforts. It provides for alternative scenarios. Under one alternative Debtor intends to execute the Plan by farming 327 acres in the first year (2003 wheat and milo crops) and, as soon as such programs reopen, debtor will enroll all of his owned property (320 acres) and all of the property he leases in the Conservation Reserve Program (CRP).

After crop year 2003, debtor intends to have some 500 acres in CRP and produce no crops. All income will be derived from CRP payments. Under the second alternative, debtor would continue to farm 327 acres, owned and leased, and enroll one of his quarter sections in CRP. Income would be derived from wheat and milo crops and CRP.

Where debtor once proposed to farm some 359 acres of wheat and 216 acres of milo on owned and rented ground, and retain all of his personal and real property for use in the execution of the plan, debtor now offers to pay the Bank cash in the amount of $69,035 upon confirmation, representing the value of the debtor's farming equipment, motor vehicles and his royalty interest as found by this Court in the March Order. The funding for this cash payment will come from an inheritance to be received by the debtor's wife.[8] Under the Plan's terms, upon payment of the $69,035, the Bank's liens on the personalty would be released. The Bank would be left with only the real estate for collateral. Debtor's counsel advised at trial that the contemplated cash payment was absolutely conditioned upon the Bank releasing its liens on the personalty. The Bank has objected to a release of its liens in this collateral.

Debtor then proposes to retain all of the real property (his homestead and two quarter sections of farm ground), and to repay the Bank $175,000 on a thirty-year amortization at a six percent fixed rate of interest.[9] Under the Plan, debtor would

---

**5.** *See* Dkt. 80.

**6.** *See* Dkt. 114. For ease of reference, this pleading will be referred to as the Second Amended Plan.

**7.** *See* Dkt. 125. For ease of reference, this pleading will be referred to as the Third Amended Plan.

**8.** Debtor's wife is not indebted to the Bank.

**9.** In his original plan, debtor had proposed a fixed interest rate of 8%.

make annual payments to the Bank of $12,713.56 commencing January 15, 2003 and thereafter for nine more years with a balloon payment due in 10 years.

Under either alternative, funding of debtor's Plan would be supplemented with monthly nonfarm income of $1,600 comprised of income from debtor's wife ($950), social security disability payments received by debtor's son ($400), gas royalty interest ($250) and a one-time cash gift of $3,480 from debtor's mother.[10]

The debtor's cash flow projections for the continued farming alternative were based upon a yield of 17 bushels per acre at a price of $2.50 per bushel for wheat and a yield of 40 bushels per acre at a price of $1.80 per bushel for milo.[11] Debtor testified that the current price of wheat is $3.51 per bushel and had been as high as $4.10 in the past year. Debtor also testified that the current price of milo is $2.25 per bushel and had been as high as $2.50 in the past year.

The debtor's cash flow projections for the CRP alternative were based upon a contract price of $37 per acre and a maintenance fee of $5.00 per acre, for a total CRP price of $42 per acre. The Bank's witness testified that land in Kearny County commanded CRP contract prices ranging from $30 to $36 per acre, with the $36 figure being for the best ground. Debtor rated the land that he intends to put into CRP as having a soil quality that could command a contract price at the higher end of the range.

*Debtor's Current Farm Operations*

The debtor currently has 327 acres planted in wheat for harvest in 2003: 157 acres that debtor owns, 90 acres leased

from his mother, and 80 acres leased from his mother and aunts (referred to as the "3 Ladies' Lease"). In previous years, debtor has planted milo on leased acreage (246 acres) but not on his own land. The debtor receives a 2/3 share of the wheat and milo crops on the leased acreage and 100% of the crops on his own quarter section.

The other quarter section owned by debtor is planted in grass, but it is not enrolled in CRP. Debtor testified that he has leased out this quarter section for cattle grazing the past two years but there was no evidence presented concerning the amount of pasture rent. The debtor has had an opportunity in the past to enroll this quarter section in the CRP program but had elected not to do so.

The debtor currently leases 332 acres that are enrolled in CRP. The CRP payments consist of a contract price plus a $5 per acre maintenance fee payable to the landowner. Both the debtor and the Bank's witness indicated that the amount of the contract price is dependent upon the quality of the soil and land being enrolled in CRP. Under the current leased CRP acreage, debtor testified that the contract price ranged from $31–$33 per acre. Debtor's share of the CRP payments varies. For approximately 160 acres of the leased CRP ground, debtor receives only the $5.00 per acre maintenance fee. For the balance of the leased CRP ground, debtor receives 20% of the CRP payment, or slightly more than $5.00 per acre. The Bank's witness testified that the tenant receives 20% of the CRP payments under the customary CRP sharing arrangement.

*Interest Rate*

With respect to the proposed 6 percent fixed interest rate, debtor's evidence con-

---

10. Debtor's Exhibits 1 and 2.

11. These yields and prices vary from the debtor's original cash flow projections of 27 bush-

els per acre and a price of $2.75 for wheat and 60 bushels per acre at a price of $1.80 for milo.

sisted of a copy of a rate sheet published in the January 3, 2003 edition of the Wichita Business Journal [12] and of testimony elicited by debtor's counsel from Gary Beymer, vice-president of the Bank. Beymer testified that the current *variable* rates on debtor's notes at the Bank were 6 percent and 5.75 percent. Beymer also said that the Bank had in its note case several long-term real estate notes having terms of 20 years and bearing fixed interest rates of 9.43 percent. He also noted that the Bank typically does not lend 100 percent loan to value on real estate and that it expects the borrower to bring some equity to the relationship. The Bank has no notes longer than 20 years and generally does not make agricultural real estate loans at fixed rates of interest.

Confronted with the rates on debtor's Exhibit 8, Beymer noted that the rates appeared to be for residential loans. The sheet details rates available from a variety of lenders in Wichita and the surrounding communities. Most of the lenders charge discount points in addition to the published rates. All of the lenders offer 30 and 15 year fixed rate loans and 1 year adjustable rate loans—all of which are typical residential mortgage products. Such loans almost always require some form of down payment; 100 percent loan-to-value is virtually unheard of in the residential market. The residential loan market is, of course, substantially different from the commercial or agricultural real estate market in that there is a secondary mortgage market which funds residential lending. No evidence was presented by the debtor that any of the lenders listed on Exhibit 8 would lend money on these terms secured by bare farmland. As there was no evidence of what other agricultural real estate lenders (such as the Farm Credit System) require for interest rates or other terms, the Court can only conclude that the rates charged by the Bank (6 percent variable and 9.43 percent fixed) are characteristic of current interest rates in the market where this debtor is located and that a 20–year term on a commercial bank's agricultural real estate loan (as distinguished from, for example, Farm Service Administration or Farm Credit System) is consistent with the market.

*Feasibility*

The evidence with regard to feasibility was lengthy and sometimes confusing. Debtor testified that he had the funds available to pay the $69,035 cash payment, the first payment to the Bank under the plan of $12,713, and the trustee's fee. The source of these funds is an inheritance to be received by debtor's wife from her deceased father's estate. The funds are available upon the debtor's request.

With respect to debtor's current wheat crop, debtor testified and the Court finds that he has planted 327 acres of wheat for summer 2003 harvest as set forth previously. Debtor will be entitled to two-thirds of the wheat crop harvested on the leased ground (170 acres) and all of the wheat crop on his own quarter section (157 acres). Debtor testified that the wheat crop looks very good. He projects an average yield of 17 bushels per acre which, he says, is roughly calculated by taking an average of his full share of 24 to 27 bushels per acre on his own ground and the two-thirds share he will receive on the leased ground.[13] In its March Order, this Court

---

**12.** Debtor's Ex. 8.

**13.** At the first confirmation hearing, debtor projected a wheat yield of 27 bushels. At this hearing, in response to the Court's questioning, the debtor estimated a "gross" yield of between 24 and 27 bushels. The debtor testified that the average projected yield on wheat was based upon a ledger sheet that he received from the elevator and reflected only his

found that debtor's projection of 27 bushels per acre was well in excess of what debtor had produced in the five years preceding. Indeed, the debtor harvested no wheat for sale in 2002, testifying that the drought conditions caused the crop to dry up, yielding only a small amount of grain which debtor retains as seed.

If he continues crop farming, debtor intends to plant milo on 246 acres with a projected yield of 40 bushels per acre. By comparison, in the March Order, the Court found that debtor had harvested nearly 60 bushels per acre on a 40 acre tract in 2001, but none in 2000 when the county average was 61 bushels per acre and only 4.9 bushels per acre in 1999 when the county average was 59 bushels. Debtor had no milo crop in 2002 as dry conditions prevented him from even planting a milo crop. The Court takes judicial notice of the historic drought conditions which obtained in southwest Kansas in the summer of 2002.

Summarizing, if debtor continues his cropping operations, he hopes to harvest and sell in 2003 $13,889 in wheat (327 acres × 17 bushels/acre × $2.50/bushel) and $17,712 in milo (246 acres × 40 bushels/acre × $1.80/bushel).[14] From the leased ground already enrolled in CRP (332 acres), the debtor projects income in 2003 totaling $8,173 (January deficiency payment of $6,099 and October CRP pay-

ment of $2,074) and slightly less in 2004 (January deficiency payment of $5,235 and CRP payment of $2,074).[15] Debtor anticipates enrolling his existing grass quarter in CRP in October 2003. Other than hearsay reports by both the debtor and Beymer concerning what the CRP program *might* entail in 2003, there was no firm evidence of when enrollment might commence, what the terms of the program will be, or the contract price that debtor will obtain. Nonfarm income contributes approximately $1,600 per month. Debtor is to receive a one-time gift from his mother of $3,480 but the gift has not been made and other than his statement that it is forthcoming, there is no other support for it in the record.[16]

The debtor's other alternative for execution of the Plan entails his completion and harvest of the 2003 wheat and milo crops and eventual enrollment in CRP of all ground leased or owned by him. Without hard evidence of what the government's CRP program might be in 2003, this option is very difficult to evaluate. Debtor projects wheat crop income of $13,898 for 2003 (as calculated above) but milo crop income of $12,204 for 2003 (167 acres of milo rather than the previous 246 bushels). In addition to the 332 acres of leased CRP already in place, debtor will enroll his

share of the wheat. The referenced ledger sheet was not offered at trial.

14. The projected wheat and milo income for 2004 declines markedly to $10,495 for wheat and $5,972 for milo. No explanation was proffered for the reduced figures in 2004 and the debtor provides no projections of farm crop income beyond 2004.

15. Comparing these figures from the spreadsheet, the Court observes that they do not match the figures in the comments and notes on Debtor's Exhibit 2. According to the comments on the first page of Exhibit 2, debtor would collect $12,513 in October 2003 (defi-

ciency payment of $4,025 and CRP payments of $2,050 and $6,437). Nor has the Court been able to replicate the CRP computations for debtor's share of the CRP income assuming there are 332 leased acres in CRP as testified by debtor. The *gross* CRP income for the 332 acres at a $32/acre contract price and a $5/acre maintenance fee calculates to $12,284. A 20% tenant share amounts to about $2,457 and a tenant share comprised only of the maintenance fee amounts to $1,660.

16. It appears that debtor has included this gift in his projections for December 2002.

grass quarter section in CRP as well as his quarter section that is currently planted to wheat. In the coming years, the debtor anticipates that he will enroll another 340 acres, presumably to be leased from his mother, the "three ladies," or other landlords. As to this acreage, he anticipates receiving two-thirds of the CRP payments. This seems less than reasonable, however, given the debtor's current CRP share on the existing leased CRP ground (332 acres), and the undisputed evidence that the customary CRP "rent" arrangement is no more than twenty percent of the payment.[17] Again, the Court received no evidence concerning who these new landlords would be, what the landlord-tenant share arrangement would be, the terms of the 2003 and future CRP program, or the contract price the enrolled ground would obtain. Debtor has not met his burden of proof concerning the terms of his participation in CRP or his anticipated receipts from the program or his landlords.

Evidence was presented that the debtor has failed to pay the real estate taxes for the year 2002 on the two quarter sections secured to the Bank. The taxes only amount to $800 but the default status results in a real property tax lien on the land that primes the security interest of the Bank and, accordingly, impairs its secured position.

Debtor's projections also include a very minimal ($253/month) allowance for equipment repair and no allowance for equipment replacement. The newest equipment owned by debtor is ten years old.

The Court also finds that the debtor has been unsuccessful in meeting the projections he made in support of his original plan that was denied confirmation. There, he projected a 27 bushel per acre wheat crop for 2002 but harvested only seed wheat. He projected a forty bushel per acre milo crop in 2002 but failed to even *plant* a milo crop. Apparently no insurance or other crop protection was in place regarding the crops. This, unfortunately, is consistent with his previous farming performance as found by this Court in the first confirmation hearing.

### CONCLUSIONS OF LAW

■ Section 1225(a) contains the requirements for confirmation of a plan. The debtor has the burden of proving all elements necessary for confirmation of the Plan.[18]

The Bank objects to the Plan on several grounds. First, it questions whether a debtor who intends to rely solely on CRP payments for funding the plan and not production of crops is a "family farmer" eligible for Chapter 12 relief. Second, it objects to the plan's fixed interest rate of 6 percent. Third, the Bank raises feasibility and questions the debtor's ability to perform to expectations under either the CRP or continued farming alternative of the Plan. Finally, the Bank objects to the "stripping" of its lien from the personalty upon debtor's $69,035 cash payment.

*Debtor's Chapter 12 Eligibility*

■ The issue presented here is somewhat unique from nearly all of the reported cases found by the Court con-

---

**17.** Debtor testified that he was "positive" that he deducted the landlord's share of the CRP payments from his CRP income projections. The Court is not persuaded by debtor's testimony. The Court is unable to reconcile the debtor's projected CRP income with its own calculations, even assuming that debtor's total CRP payment would be $42 per acre. It

appears to this Court that the debtor has included the landlord's share of the CRP payment in his projections.

**18.** *In re Ames*, 973 F.2d 849, 851 (10th Cir. 1992), *cert. denied* 507 U.S. 912, 113 S.Ct. 1261, 122 L.Ed.2d 658 (1993).

cerning eligibility. There is no question, and the Bank concedes, that at the time of debtor's bankruptcy filing he was eligible for Chapter 12 as a "family farmer" engaged in a "farming operation" as those terms are defined in the Bankruptcy Code.[19] The Bank argues that the debtor is no longer eligible for Chapter 12 because of his proposal to convert, after confirmation, from a farm cropping operation to total CRP. The Court concludes, however, that this post-confirmation conversion does not impair debtor's eligibility for Chapter 12 relief.

The test for a "family farmer" as described in 11 U.S.C. § 101(18)(A) clearly provides that the debtor's status is determined at the time the case is filed and is measured *inter alia* by a gross income requirement for the taxable year preceding the taxable year of filing.[20] Nowhere does the Code suggest that a debtor must *continue* to satisfy the test for a "family farmer" throughout the pendency of the case or through completion of the plan of reorganization. Nor does the Code suggest that a farmer's post-confirmation change in status divests him of eligibility.

One bankruptcy court has so held. In *In re Lockard,*[21] the debtor filed bankruptcy in 1998. That same year the debtor moved out-of-state and obtained off-farm employment. He turned over the day-to-day operation of his turkey farm to a full-time resident manager and had an oral agreement to sell the turkey farm to the manager in five years. The creditor argued that the debtor had abandoned farming and objected to confirmation of the debtor's plan or reorganization. The bankruptcy court rejected the creditor's argument.

This Court's research has not disclosed any case holding that a Chapter 12 debtor must *continue* farming—or even *promise* to continue farming—throughout the life of the plan in order to remain in a Chapter 12 bankruptcy proceeding, and the Bankruptcy Code does not contain any such requirement.... [T]here is nothing in the Code that would require the debtor to *remain* in farming in order to obtain confirmation of a plan or to remain in farming once a plan is confirmed.... [O]nce qualified to file under Chapter 12, there is nothing to prevent the debtor from obtaining off-farm employment to help finance the Chapter 12 plan, from reducing the farm operations, selling part of the farmland, reducing the size or types of livestock herds, etc.

\* \* \* \* \* \*

The Court does not accept the argument that a Chapter 12 debtor must continue farming for the life of the plan in order to obtain confirmation of a proposed reorganization plan.[22]

The Court has reviewed the case authorities relied upon by the Bank in support of its argument and concludes that they are

---

**19.** 11 U.S.C. § 101(18)(A) and § 101(21). *See also, In re Tim Wargo & Sons, Inc.,* 74 B.R. 469, 472 (Bankr.E.D.Ark.1987) (The court is required to examine the debtor's activities as of the petition date, citing *In re Tart, infra.*); *In re Fenske,* 96 B.R. 244, 246 (Bankr.D.N.D. 1988) (For a chapter 12 case filed in 1988, the relevant year for determining whether debtor is a family farmer is 1987).

**20.** Section 109(f) of the Code provides that "[o]nly a family farmer with regular annual income may be a debtor." The phrase "family farmer with regular annual income" is further defined in § 101(19). While neither of these code provisions specifies the time period that a debtor must be engaged in farming operations, the definition of a "family farmer" does so specify.

**21.** 234 B.R. 484 (Bankr.W.D.Mo.1999).

**22.** *Id.* at 491.

factually distinguishable from the case here. The Bank's primary case, *In re Tart*[23] deals with a fact setting where the debtor had ceased farming operations *before* filing bankruptcy and it was clear that the debtor would no longer be a farmer. In *Tart*, the debtors had sold all of their farmland prior to filing bankruptcy, had become disabled, and stated in their plan that they did not intend to continue farming.[24]

The Bank's other authorities are likewise distinguishable on their facts and involve questions of initial eligibility.[25] In any event, to the extent the Bank's authorities are not distinguishable, the Court concludes that these courts' reliance on legislative history to craft an unwritten "exception" to chapter 12 eligibility lacks support in a very clearly-drawn statute, § 101(18)(A), and respectfully disagrees with their conclusions.

The Bank also seizes upon dicta in *In re Fenske*[26] suggesting that the placement of all farm ground in government programs disqualifies the debtor from eligibility:

> ... Those individuals who while actively engaged in farming, avail themselves of such programs [CRP and ASCS set aside] and thereby maximize the profitability of their operations are no less engaged in a farming operation. The only exception is where the farmer essentially abandons farming as a livelihood and becomes merely a passive recipient of investment income. In that case income derived from wholesale cash

renting of land or CRP enrollment is not derived from a farming operation.[27]

The short answer to this is that *Fenske* did not present facts involving a post-confirmation conversion from "active" farming as contemplated by the debtor here under one of two plan alternatives. The Court in *Fenske* clearly determined eligibility as of the time the petition was filed and was examining the debtor's income in the preceding taxable year.[28] The *Fenske* court made it equally clear that the fact that a portion of land is enrolled in CRP does not automatically eliminate the resulting income as income from farming operations.[29]

Finally, the Court notes that the debtor in the instant case proposes two alternatives for effectuating his Plan. There is no certainty that the CRP alternative will be the means ultimately used to carry out debtor's Plan. Thus, there is no assurance that debtor will in fact convert from crop farming to CRP. Moreover, even under the "full CRP alternative," debtor's wheat and milo crops to be harvested in 2003 (*i.e.* post-confirmation) make up a sizeable portion of the projected funding for debtor's Plan (approximately $30,000) and clearly constitute income from a farming operation. Thus, it cannot be said that debtor's Plan is funded entirely from CRP, even if debtor subsequently converts all available acreage, whether owned or leased, to CRP. The debtor is eligible for Chapter 12 relief.

*Interest Rate*

 The definitive case in this Circuit concerning the appropriate interest rate is

---

23. 73 B.R. 78 (Bankr.E.D.N.C.1987).

24. *Id.* at 79.

25. *See e.g., In re Tim Wargo & Sons, Inc.*, 74 B.R. 469 (Bankr.E.D.Ark.1987) (The Wargo family had ceased farming prior to filing bankruptcy and leased all of their land to a tenant farmer.); *In re Fenske*, 96 B.R. 244 (Bankr.D.N.D.1988) (The year prior to filing bankruptcy debtors' land was under a cash

lease to a trust formed by debtors; the land was farmed through the trust.).

26. 96 B.R. 244 (Bankr.D.N.D.1988).

27. *Id.* at 247.

28. *Id.* at 246.

29. *Id.* at 247.

*In re Hardzog.*[30] There, the Court of Appeals has instructed that in the absence of special circumstances, such as the market rates being higher than the contract rate, bankruptcy courts should use the current market rate of interest, determined by looking at similar-type loans in the region, when determining a plan's interest rate.[31] Neither debtor nor the Bank makes an argument that this case involves "special circumstances." The only evidence before the Court of interest rates for agricultural real estate loans in Kearny County is the current *variable* rate of 6 percent and the current fixed rate of 9.43 percent. The residential mortgage loan interest rates for the Sedgwick County vicinity are simply inapposite under Hardzog. The Court further concludes that a 20–year term, rather than the 30–year term proposed by debtor, conforms to the market for agricultural real estate loans.[32] This treatment is ameliorated to some degree by the debtor's proposal to make a balloon payment at ten years. The feasibility of that payment is, however, open to question. The plan treatment proposed by debtor for the Bank does not comply with *Hardzog* and is not confirmable.

### Feasibility

■ The Code's feasibility requirement is contained in § 1225(a)(6) and requires that debtor "will be able to make all payments under the plan and to comply with the plan." The feasibility standard for confirmation of a Chapter 12 plan was stated and applied in *In re Ames:*[33]

Although debtors are not required to guarantee the success of the plan, they must provide "reasonable assurance that the plan can be effectuated." *In re Hopwood,* 124 B.R. 82, 86 (E.D.Mo. 1991). A plan's "income projections must be based on concrete evidence and must not be speculative or conjectural." *In re Novak,* 102 B.R. [22] at 24 [(Bankr. E.D.N.Y.1989)].[34]

■ In *In re Honeyman*[35], the bankruptcy court stated the test of feasibility in this way:

The court must be persuaded that it is probable that a plan will be able to cash flow based upon realistic and objective facts (as opposed to visionary or overly optimistic projections).

■ The Plan's proposed CRP alternative is characterized by precisely the speculative or conjectural projections that *Ames* cautions against. Like the bankruptcy court in *Ames,* this Court cannot place a value on the CRP alternative with any degree of confidence. The income projections for the CRP alternative are almost entirely reliant on variables, unknowns, and events beyond the debtor's control. The Court has before it no concrete evidence of what future CRP programs will be available, the enrollment period for such programs, debtor's eligibility, nor the terms of any such CRP contract. Even if the Court assumes that there will be an open enrollment in 2003 for a CRP program, there is no firm evidence of what the terms and conditions of the CRP program will be and there is no

---

**30.** 901 F.2d 858 (10th Cir.1990).

**31.** *Id.* at 860.

**32.** Of course, if the personal property were sold and the Bank's lien therein was retained, the Bank would be oversecured and entitled to its contract rate through confirmation. *See* § 506(b).

**33.** *In re Ames,* 973 F.2d 849, 851 (10th Cir. 1992), *cert. denied* 507 U.S. 912, 113 S.Ct. 1261, 122 L.Ed.2d 658 (1993).

**34.** *Id.* at 851.

**35.** 201 B.R. 533, 537 (Bankr.D.N.D.1996).

assurance that those terms and conditions will be anything like the current CRP contract with respect to the 332 acres leased by debtor. With respect to additional leased acreage that debtor intends to put into CRP in the future, the Court likewise has no concrete evidence of the number of leased acres available to be enrolled in CRP, the quality of the leased acreage and the contract price the land is likely to attain, the identity of the landlords and their assent to CRP sign-up, or the terms of any lease agreements (*i.e.* the landlord-tenant CRP share arrangement). As noted previously, a one-third/two-third division commonly found in a crop share lease is not the norm for CRP leases and debtor has never realized a one-third share as a tenant on CRP ground. Yet debtor's projections assume such favorable terms. The Court concludes that the CRP alternative is far too speculative and conjectural to place any reasonable assurance that it can be effectuated.

■ On its face, the continued crop farming alternative is marginally feasible but for the fact of debtor's historical poor performance. The Bank has questioned debtor's projected crop yields for good reason. While the drought conditions may account for debtor's (and other farmers) poor performance in 2002, this is not the first year that debtor has experienced poor results. The Court has been presented with several years of below average performance. The fact remains that debtor has consistently failed to meet his projections. The Court's confidence in the debtor's ability to make the plan payments does not increase when, while under the Court's protection, he cannot manage to keep his real estate taxes current. The Court can only conclude that debtor's projections are "visionary" and that it is im-

probable that debtor can meet those projections.

Unfortunately for debtor, even if he can attain the crop yields projected, an increase in the rate of interest or a reduction in the repayment term would appear to push debtor over the feasibility edge. Indeed, it appears that debtor's payment would increase to $16,932 if the $175,000 debt is amortized at 6% over 20 years, rather than 30 years. While debtor could make this payment in 2003 and 2004, the decay in his cash position caused by the increased payment would keep him from making the payment in 2005.

The Court is also skeptical of debtor's ability to effectuate the Plan in ten years when (1) the balloon payment of approximately $145,000 comes due; (2) the CRP contracts sunset; and (3) debtor will be 67 years of age.

For all of the foregoing reasons, the Court concludes that debtor's Plan is not feasible.

*Severance of the Bank's Cross–Collateralization*

■ In its March Order, the Court denied confirmation in part because the debtor's plan deprived the Bank of its cross-collateralized liens. Section 1225(a)(5)(B)(i) requires that a secured creditor retain its lien. Here, the Bank had a prepetition lien in debtor's real estate and personalty (farm machinery and equipment, vehicles, and a gas royalty interest) and was cross-collateralized. The full amount of the Bank's allowed secured claim as determined at the first confirmation hearing is $244,035. This value was comprised of debtor's real estate and items of personalty.

The debtor now proposes to pay $69,035 cash as full value of the personalty and in return seeks a release of the Bank's lien in

the personalty. The Bank would retain its lien in the real estate. Essentially, the debtor once again proposes to sever the Bank's cross-collateralization. The Court disagrees with debtor that he is paying the full amount of the allowed secured claim with his proposed cash payment for the personalty. The full amount of the allowed secured claim is $244,035 and includes both realty and personalty. The Bank is the holder of a single claim.[36] What the debtor has proposed is in fact a partial payment of the allowed secured claim and a severance of the Bank's lien from the "paid-for" items of collateral.

The Court has carefully reviewed *Harmon v. U.S. Through Farmers Home Admin.*[37] cited by the debtor in support of his position and is not persuaded that it permits the severance of a creditor's cross-collateralization. *Harmon* did not involve a claim that was originally cross-collateralized. As the Court reads Harmon, it speaks to the situation where an undersecured creditor seeks to retain its lien on the unsecured portion of its bifurcated claim (§ 506(a)) after the secured portion is paid. The court in *Harmon* interpreted the lien retention requirement in § 1225(a)(5)(B)(i) and held that the creditor's lien need only be retained in the secured portion of the claim. Upon payment of the creditor's allowed secured claim, the debtor was entitled to a release of the lien. In essence, the debtor can "strip" the creditor's lien from the unsecured portion of the creditor's claim.

This is not the case here. Debtor here proposes to pay only a portion of the allowed secured claim and seeks to strip the Bank's lien from the personalty securing the claim. In doing so, the debtor is severing the cross-collateralization and altering the Bank's lien.[38] Where the Bank previously had a lien in both real estate and personalty, it would be left only with a lien in debtor's real estate.[39] The debtor has cited the Court with no authority allowing the severance of the Bank's cross-collateralization. Accordingly, the Court concludes that this plan treatment of the Bank's claim runs afoul of the lien retention requirement in § 1225(a)(5)(B).

*The Bank's Motion for Modification of Stay*

▬ The Bank filed its Motion to Modify Stay on July 31, 2002.[40] In its motion, the Bank asserted that debtor lacked equity in the property and that the Bank lacked adequate protection. The debtor filed a timely objection to the Bank's motion[41] in which he responded that the property which secures the Bank's claims is essential to his operations and that he was prepared to offer adequate protection payments concerning the equipment and vehicles until his amended plan could

---

36. The debtor's apparent interpretation of the Bank's claim is that the Bank has a separate and distinct allowed secured claim for each of the four types of collateral (real estate, equipment, vehicles and gas royalty interest) valued by this Court in the first confirmation hearing.

37. 101 F.3d 574 (8th Cir.1996).

38. This is not fundamentally different than subordinating a creditor's lien or giving a substitute lien. Neither is permitted. *See In re Beach,* 169 B.R. 201 (D.Kan.1994); *In re Ames, supra.*

39. Chapter 12 plan that proposed to substitute a second mortgage interest in debtors' ranch for the bank's original lien in debtors' livestock and equipment did not comply with § 1225(a)(5)(B)(i). *See In re Ames, supra* at 851.

40. Dkt. 94.

41. Dkt. 98.

reach hearing. The Bank waived the thirty-day hearing requirement of § 362(e) and this Court continued the hearing on the Motion to the day of the confirmation hearing. With the denial of confirmation of debtor's Plan as set forth herein, grounds exist for the Bank's motion for relief to be granted. While it does not appear that the debtor lacks equity in his property, this Court has found above that the likelihood of a successful reorganization is slim. The debtor's second attempt to confirm a Chapter 12 plan having been denied, cause exists for granting the Bank relief from the automatic stay and its Motion is accordingly granted.

### SUMMARY

Confirmation of the debtor's Plan must be denied. The Plan fails to propose a market rate of interest in accordance with *Hardzog,* fails to comply with the lien retention requirement of § 1225(a)(5)(B)(i), and is not feasible under § 1225(a)(6).

IT IS THEREFORE ORDERED that confirmation of Debtor's Third–Amended Chapter 12 Plan of Reorganization is DENIED. The Bank's Motion for stay relief is GRANTED as set forth above. Debtor is granted 20 days to convert his case to Chapter 7 or the case will be DISMISSED.