**In re Jeffrey R. NELSON and Terry Lyn Nelson, Debtors.**

No. 02–42022.

United States Bankruptcy Court, D. Idaho.

April 17, 2003.

Forrest Hymas, Jerome, ID, Chapter 12 Trustee.

Craig R. Jorgensen, Pocatello, ID, for Debtors.

Kevin K. Allen, Logan, UT, for Cache Valley Bank.

## MEMORANDUM OF DECISION RE CONFIRMATION

JIM D. PAPPAS, Chief Judge.

### Introduction

On March 25, 2003, the Court conducted a hearing on confirmation of the above Debtors' proposed Amended Chapter 12 Plan ("the Plan"). Docket No. 56. At the hearing, the Court received evidence and testimony, and entertained oral arguments and comments from counsel for the parties and the Chapter 12 Trustee, Forrest Hymas. The only unresolved objection to confirmation of the Plan appears to be that filed by creditor Cache Valley Bank ("the Bank"). Docket No. 62. The Chapter 12 Trustee recommended that the Plan be confirmed in his written reports to the Court. Docket Nos. 65, 66.

After due consideration of the evidence, testimony and arguments of the parties, the Court intends this Memorandum of Decision to constitute its findings of fact and conclusions of law. Fed. R. Bankr.P. 7052; 9014.

### Generally

The Court will address some of the Bank's specific objections to confirmation of the Plan in detail below. However, two of the grounds urged by the Bank have obvious merit, as discussed by the Court in its comments made on the record at the conclusion of the hearing. These plan deficiencies must be addressed in order for Debtors' plan to be confirmed. For clarity, these matters bear only the briefest mention again here.

■ First, the Plan proposes that Debtors retain a dairy farm and two vehicles that are subject to liens in favor of the Bank. As the Bank correctly notes, the Plan fails to clearly provide that while the Debtors are making the proposed deferred payments to the Bank to satisfy its allowed secured claim, the Bank shall retain its liens in Debtors' assets. The failure to include clear lien retention language in Debtors' Plan violates 11 U.S.C. § 1225(a)(5)(B)(i) of the Code and alone prevents confirmation. However, counsel for Debtors indicates this defect resulted from an inadvertent oversight during drafting of the Plan, and he argues it is a matter that can easily be remedied by an amendment adding the language required by the statute to the Plan provision. The Court concludes Debtors should have the opportunity to so amend the Plan.

■ Secondly, the Plan relies for its funding, in part, on lease payments to be generated when Debtors lease out the dairy barn and related improvements on their farm to a third party. Debtors testified they have had discussions with two potential lessees, and that a lease would generate at least $1,000 per month. Therefore, they included this sum in their projected budget to show their plan is feasible. However, Debtors acknowledge they have not as yet negotiated such a lease because they felt it necessary to obtain confirmation of the Plan before committing to a tenant.

Debtors' approach is problematic. Until Debtors have a committed lessee paying rent of at least $1,000 per month, Debtors can not show they will be able to make the payments proposed by the Plan as required by 11 U.S.C. § 1225(a)(6). The Bank's objection on this basis is also well taken. Again, based upon the evidence, the Court concludes Debtors should have an opportunity to negotiate and finalize a proposed lease, contingent upon confirmation of another plan.[1]

For these two reasons, the Court is unable to confirm Debtors' Amended Plan. As indicated below though, they will be given the chance to remedy these defects by filing another amended plan.

Before addressing the Bank's specific objections, two other issues raised in this case by the Bank's objection can also be disposed of in a summary fashion. One involves the value assigned by Debtors to the land securing the Bank's claim; the other involves the proposed interest rate

---

1. The Plan is also partially funded by Debtors' use of $39,500 in government program payments currently being held by the Trustee. Debtors are involved in litigation over their entitlement to such funds with the Bank in a pending adversary proceeding, which litigation would continue after confirmation of Debtors' Plan. However, Mr. Nelson testified, and the Trustee apparently agrees, that the Plan is sufficiently funded to pay the Bank's claim even if Debtors are unsuccessful in wresting the government monies from the Bank.

payable to the Bank as proposed in the Plan. Debtors submitted evidence on both these issues; the Bank submitted no evidence. The Court concludes the Bank's objections lack merit.

Debtors propose to pay the Bank $125,000 with 6% interest in monthly payments over 30 years to satisfy the Bank's secured claim on Debtors' real property. The Court heard the testimony of Stephen Meek, a qualified appraiser offered by Debtors, who opined that Debtors' land and improvements have a current fair market value of $114,500. The Court has no reason to doubt the credibility or reliability of Mr. Meek's opinion of value, and thus accepts his value opinion as fact.

Debtors' proposal to pay the Bank $125,000 for this real estate is therefore appropriate in light of 11 U.S.C. § 506(a) and § 1225(a)(5)(B)(ii) of the Code. So too, the evidence shows, and the Court finds and concludes, that the 6% interest rate offered by Debtors to the Bank over a repayment term of 30 years is also reasonable in light of the nature of the property, current market conditions, and prevailing lending terms, something the Bank made no effort to contradict. Since Debtors are actually proposing to pay the Bank more than the fair market value of the real estate, in addition to interest on the deferred balance, the Court concludes the Bank will receive adequate "value" through the Plan. The Bank's objection to Debtors' proposal to pay it $125,000 with 6% interest over 30 years is therefore overruled.

### Specific Objections Requiring Detailed Consideration

Two other arguments asserted by the Bank in opposition to confirmation of Debtors' Plan deserve extended analysis by the Court. They also require that the Court recite additional facts relevant to the Bank's contentions.

Debtors are long-time dairy farmers. They have operated a small dairy in rural Franklin County, Idaho for several years. Debtors applied to the Bank for a loan. Mr. Nelson testified that one purpose of the loan was to satisfy the debt of creditor Ron Randall, which debt was secured by Debtors' cattle. However, when the loan proceeds were disbursed, Mr. Nelson testified the Bank's officer decided Debtors' unsecured trade creditors should be paid instead of Mr. Randall. Therefore, Mr. Nelson testified, Debtors struggled financially; they could not pay Mr. Randall and other creditors as well as the Bank, and they eventually failed financially, especially when milk prices markedly declined. As indicated above, the Bank submitted no testimony or evidence at the hearing to dispute Mr. Nelson's view of the facts.

Debtors filed for relief under Chapter 12 on October 18, 2002. By that time, many of their cows and some of their equipment had been repossessed by secured creditors. Still, Debtors continued to milk their cows for a time after filing for bankruptcy, and in December, they proposed a Chapter 12 plan that called for them to retain the dairy operation and pay their debts primarily from its income. Docket No. 31. However, in connection with confirmation proceedings concerning that plan, in February, 2003, Debtors apparently reconsidered their approach, agreed to allow the Bank relief from the automatic stay, and consented to the repossession and sale of their remaining cattle and equipment by the Bank.

The Plan as now proposed is funded largely by Mr. Nelson's income from his new employment as a dairy manager for a third party. Mrs. Nelson also works off of the farm for wages. Mr. Nelson testified Debtors are committed to rejuvenating their now defunct dairy operation as soon as they can obtain the funds to do so,

either by borrowing money for capital, or possibly by engaging in a joint venture of some sort with Mr. Nelson's employer. The Court finds that Debtors are sincere in their intent to return to active farming. On the other hand, there was no real evidence offered to demonstrate Debtors can be successful in their search for start-up capital to renew their business operation, at least not in the near-term.

Given this factual backdrop, the Court turns to the Bank's additional objections to confirmation of Debtors' Plan.

### Good Faith

■ The Bank argues Debtors have not submitted their Plan nor sought Chapter 12 relief in good faith as required by § 1225(a)(3). While some of Debtors' pre-bankruptcy conduct was less than exemplary, the Court respectfully disagrees with the Bank's view of the facts and overrules this objection.

The Bank's loan was secured by a lien on most of Debtors' dairy herd, facilities and equipment, and payments were made via an assignment of milk proceeds from the creamery where Debtors sold their milk. The Bank alleges, and Mr. Nelson admits, that prior to filing for bankruptcy, Debtors sold a significant number of cattle that were collateral for the Bank's loan and neither advised the Bank of their actions nor turned over the sale proceeds to the Bank. Instead, Mr. Nelson testified he used the money, under the pressures of declining cow numbers and low milk prices, to pay for feed and other expenses for operating the dairy.

The Bank also alleges Debtors used a cash insurance settlement for wind damage to one of their buildings without making repairs to the building and without consent of the Bank, which held a lien on the buildings and land. Again, Mr. Nelson admits using the money, but explains it

was also needed to meet operating expenses at the dairy.

The Bank also points out that shortly before bankruptcy, some of Debtors' equipment, in which the Bank held a lien, was repossessed by another who, according to the Bank, had no lien on the items. The Bank complains that Debtors took no affirmative action to regain possession of the property. Debtors also allegedly allowed a neighbor to repossess some of their property for nonpayment of pasture rent to the prejudice of the Bank.

Finally, the Bank alleges Mr. Nelson at first agreed to allow the Bank to repossess the cattle, but then, when the Bank's agents attempted to take possession of the animals, refused to follow through on the agreement.

■ Confirmation of a Chapter 12 plan requires that "the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1225(a)(3). Because the term "good faith" is not explicitly defined by the Bankruptcy Code, the Ninth Circuit has explained that good faith requires a court to consider the totality of the circumstances, and that the term "is generally interpreted to mean a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Traders State Bank of Poplar v. Mann Farms, Inc. (In re Mann Farms, Inc.)*, 917 F.2d 1210, 1214 (9th Cir.1990) (noting cases dealing with Chapters 11 and 13 are equally relevant in determining good faith under Chapter 12); *see also In re Barger*, 233 B.R. 80, 83 (8th Cir. BAP 1999). The court in *Mann Farms* further instructed that proposed plans should be reviewed for "fundamental fairness" in dealing with creditors' claims, and if this exists, confirmation is appropriate. *Mann Farms, Inc.*, 917 F.2d at 1214.

 A significant additional body of case law has developed specific to good faith in Chapter 12.[2] These authorities generally line up with this Court's decisions interpreting the good faith required in the Chapter 13 context under 11 U.S.C. § 1325(a)(3).[3] To summarize, the good faith requirement prevents confirmation of plans proposed by those who are dishonest with the court or creditors, uncooperative, inequitable in their dealings, or who attempt to manipulate the bankruptcy process. A debtor's prepetition actions can serve as the basis for finding bad faith, but such actions must demonstrate the debtor was trying to treat creditors inequitably or otherwise hinder, delay or defraud them. Acts reflecting poor judgment but motivated by a good faith intent to achieve legitimate goals will not likely support a finding of bad faith. Finally, in some cases, even activity that suggests bad faith can be satisfactorily explained or rebutted.

In this case, Debtors' conduct toward the Bank was less than exemplary. By contract, Debtors apparently[4] granted the Bank an interest in their assets to secure the credit extended to them by the Bank. The Bank was entitled to be consulted concerning the disposition of Debtors' assets, and to an opportunity to protect its interests. If Debtors sold or disposed of the Bank's collateral without such consultation, the Bank was deprived of its rights.

On the other hand, the evidence is undisputed that Debtors utilized all of the proceeds from the disposition of any assets in which the Bank held a security interest to continue their dairy operations. During this time, the Bank continued to receive payments via a milk sale proceeds assignment. In addition, the Bank held a lien in Debtors' livestock. Under the circumstances, it can be argued that by using cow sale proceeds to buy more cows, or to pay the expenses of caring for the cows so as to produce more milk, and to sustain Debtors' operation, the Bank's interests were preserved, not harmed.

Debtors' failure to cooperate with the Bank in repossessing the stock has been adequately explained by Mr. Nelson's testimony concerning his dissatisfaction with and distrust of the Bank's officers. While

**2.** *See, e.g., Barger v. Hayes County Non-Stock Co-Op (In re Marger)*, 233 B.R. 80, 83–84 (8th Cir. BAP 1999) (noting prepetition conduct is a factor to be considered and finding a lack of good faith when debtor unlawfully converted creditor's collateral and then tried to treat the creditor as unsecured); *In re Szudera*, 269 B.R. 837, 844–45 (Bankr.D.N.D.2001) (looking at whether the debtor had unfairly manipulated the Code, and finding a lack of good faith when the plan favored an insider over other creditors and multiple filings had prejudiced creditors); *In re Luchenbill*, 112 B.R. 204, 208–10 (Bankr.E.D.Mich.1990) (finding a lack of good faith when the debtor failed to accurately or timely disclose assets and sources of income); *In re Zurface*, 95 B.R. 527, 536 (Bankr.S.D.Ohio 1989) (finding a lack of good faith when debtor engaged in prepetition attempts to hide assets from creditors); *In re Land*, 82 B.R. 572, 576 (Bankr. D.Colo.1988) (finding good faith when debtor explained his multiple filings and the purpose of the plan was to reorganize farming operation). Because they are consistent in their approach, these decisions need not be discussed in detail here.

**3.** *See, e.g., In re Haas*, 01.4 I.B.C.R. 132, 133 (Bankr.D.Idaho 2001) (citing a nonexclusive list of eleven factors relevant in determining bad faith and citing *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1389–90 (9th Cir.1982)); *In re James*, 01.1 I.B.C.R. 30, 31–32 (Bankr.D.Idaho 2001) (looking at whether a debtor misrepresented facts in the plan, manipulated the Code, or proposed an inequitable plan); *In re Yochum*, 96.2 I.B.C.R. 77, 78 (Bankr.D.Idaho 1996) (focusing on debtor's lack of candor in filling out schedules and disclosing income, and debtor's inequitable treatment of particular creditors).

**4.** The Bank's loan and security documents were not offered into evidence at the hearing.

the Court can not and does not expressly find on this limited record that Mr. Nelson was justified in feeling the Bank breached its agreement to pay off other creditors from the loan proceeds, the Bank offered no testimony or evidence to counter his version of the facts. Mr. Nelson's explanations therefore add a certain context to his actions.

While the conduct of Debtors is understandably criticized by the Bank, the Court is persuaded Debtors acted with the legitimate goal in mind of preserving their operation, and were motivated, at least in part, by their desire to work out their financial difficulties and pay all their creditors. The Bank offered no evidence to suggest Debtors were not sincere in distrusting the Bank. There is nothing in the record to show Debtors' conduct was motivated by ill-will toward the Bank or intended to harm its interests in the collateral. Debtors may have exercised poor judgment in many respects, but the Court is satisfied that the actions they took in derogation of the Bank's contractual rights do not constitute bad faith.

Moreover, Debtors' Plan represents a bona fide effort to reorganize their financial affairs, and to treat their various creditors fairly. In other words, the Court concludes that while Debtors' Plan is deficient for confirmation purposes, their design for reorganizing is fundamentally fair to their creditors. While it is perhaps a close call under these facts, the Court declines to conclude Debtors lacked good faith in seeking Chapter 12 relief or in proposing their Plan. The Bank's objection in this respect will be overruled.

## Debtors' Eligibility for Chapter 12 Relief

■ The Bank also argues that Debtors are not eligible for relief under Chapter 12 of the Bankruptcy Code. The Bank's argument is premised upon three provisions of the Code read in concert. First, the Bank cites 11 U.S.C. § 109(f) for the unremarkable proposition that "[o]nly a family farmer with regular annual income may be a debtor under Chapter 12 . . . ." Next, the Bank refers to 11 U.S.C. § 101(18), which defines the term "family farmer" to include an "individual or individual and spouse *engaged in a farming operation . . .*" who also meets certain debt and income limitations. 11 U.S.C. § 101(18)(A) (emphasis added). Finally, the Bank refers to 11 U.S.C. § 101(21) which contains a non-exclusive [5] description of the types of activities which, for purposes of the Code, constitute a "farming operation," including "tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state . . . ." Because Debtors are not currently engaged in any of the activities constituting a farming operation, the Bank argues that Debtors are not "engaged in a farming operation" and are therefore not eligible for Chapter 12 relief.

In resolving the Bank's eligibility objection, the Court initially observes there is no dispute that Debtors were actively engaged in traditional farming activities, and therefore eligible for Chapter 12 relief, when they filed their petition in October, 2002. Debtors had operated their dairy farm for many years and their business was still functioning, albeit unprofitably, at that time. Debtors' dairy produced the

---

**5.** Because 11 U.S.C. § 101(21) defines "farming operation" to "include" the described activities, that definition is not exclusive or limited to only those activities mentioned. *See*

11 U.S.C. § 102(3) (providing the term "includes" as used in the Code is not intended to be limiting).

vast bulk of their income and gave rise to nearly all their debt. However, the Bank argues that as a condition of confirmation of their Plan, Debtors must show they continue to be eligible for relief at the time of the confirmation hearing. The Bank notes that, as of the date of the confirmation hearing, Debtors were not operating their farm, their cows and most of their farm equipment had been liquidated, and they were generating no milk products nor farm income. Therefore, the Bank contends that Debtors are no longer "engaged in a farming operation," are not eligible for Chapter 12, and that confirmation must be denied. *See* 11 U.S.C. § 1225(a)(1) (requiring that a debtor's plan comply with the provisions of Chapter 12 and with other applicable provisions of Title 11). To support its interpretation of Chapter 12 eligibility, the Bank cites *In re Buckingham*, 197 B.R. 97, 104 (Bankr.D.Mont. 1996), a decision in which Judge Peterson held that a Chapter 12 debtor must propose to "engage in some farming operations over the entire duration of the plan ..." to confirm a plan. Given the language of the statutes and the Court's respect for its colleague, the Bank's argument merits careful consideration.

Before specifically addressing *Buckingham*, the Court notes there are two more recent decisions to the contrary on this issue. In *In re Clark*, 288 B.R. 237, 245–47 (Bankr.D.Kan.2003), the court held a debtor was eligible for Chapter 12 relief even though the plan proposed to leave all farm land fallow under a government program that paid farmers to do so. *Id.* at 247. In its decision, the court agreed with other authorities suggesting that a debtor's eligibility for Chapter 12 relief should only be examined as of the time of filing the bankruptcy petition, not as of the date of confirmation. *Id.* The court concluded that "[n]owhere does the Code suggest that a debtor must *continue* to satisfy the test for a 'family farmer' throughout the

pendency of the case or through completion of the plan of reorganization. Nor does the Code suggest that a farmer's post-confirmation change in status divests him of eligibility." *Id.* at 246 (emphasis in original).

The *Clark* court also cited *In re Lockard*, 234 B.R. 484 (Bankr.W.D.Mo.1999), in which the court analyzed an objection to confirmation similar, but not identical, to the Bank's contention here. In *Lockard*, the court addressed a creditor's good faith objection to the debtor's Chapter 12 plan based in part on the fact that the debtors no longer lived on the farm property, the husband-debtor had taken up other employment, the farm operation was turned over to a hired manager, and the debtors had entered into a lease/purchase agreement with the manager for the eventual sale of the farm operation. *Id.* at 246. Declining to endorse the result in *Buckingham*, the *Lockard* court concluded that no Code provision requires a Chapter 12 debtor to continue farming, or to even represent he or she will do so, in order to remain eligible for Chapter 12 relief. *Id.* at 491. Distinguishing the cases relied upon by the creditor, including *Buckingham*, the court explained those cases merely held that a debtor must be farming at the time of filing to be eligible. *Id.* The court further opined that:

> [O]nce qualified to file under Chapter 12, there is nothing to prevent the debtor from ... reducing the farm operations, selling part of the farmland, reducing the size or types of livestock herds, etc. The Court agrees with the bank that it would not serve the purposes of Chapter 12 and would probably be inappropriate to confirm a plan if the debtor has completely ceased the farming operation ....

*Id.*

Turning to *Buckingham*, the Montana court considered two related issues. The

first involved what sort of activities may properly be considered "farming operations" under 11 U.S.C. § 101(21). The second issue, and the one of significance in this case, focused upon whether a debtor must continue farming operations throughout the Chapter 12 case in order to be eligible for relief. The court in *Buckingham* rested its decision in part upon the following excerpt from *In re Tart*, 73 B.R. 78 (Bankr.E.D.N.C.1987)[6]:

> Section 101[18] states that a "family farmer" means an individual "engaged in a farming operation;" no such language is found in the section 101[ (20) ] definition of "farmer." The inclusion of this language in § 101[ (18) ] suggests that Congress intended to require more than that a "family farmer" be engaged in a farming operation during the taxable year preceding the year in which the petition was filed. If Congress intended to focus only on this time period, the "engaged in a farming operation" language would be superfluous since it would appear that an individual who, for the taxable year preceding the year in which the petition is filed, incurred at least 80% of his debt and received at least 50% of his income from a farming operation he owned or operated, as required by § 101[ (18) ], would necessarily have been engaged in a farming operation during that same time period. A statute should not be interpreted so as to render one part inoperative, superfluous, or insignificant.

73 B.R. at 81.

The troubling aspect of the court's analysis in *Tart* as applied in *Buckingham* is that it goes too far. The court in *Tart* was correct that the phrase "engaged in a farming operation" in § 101(18) requires

an examination of more than the debtor's tax returns for the taxable year preceding the year of a debtor's filing. That said, however, the statutory language is ambiguous in that it can also be logically interpreted to require merely that the debtor, in addition to farming in the preceding year, also be actively farming at the time of filing.

Read in this fashion, a debtor who engaged in farming last tax year, but who sold the farm assets and permanently discontinued the operation before filing for bankruptcy this year would, justifiably, not be eligible for relief under Chapter 12 to reorganize any remaining debt. Such were the facts in *Tart*. 73 B.R. at 80. The Court agrees this is the result intended by Congress. Under such facts, the phrase in the statute "engaged in a farming operation" bridges the gap between a potential Chapter 12 debtor's activities at the end of the prior year and the time of filing in the current year.

While such a reading gives meaning to all the language contained in § 101(18) and prevents the use of Chapter 12 by debtors who have permanently abandoned the business and lifestyle of family farming, it stops short of imposing the additional requirement advanced by *Buckingham*—a policy not expressed by Congress—that a debtor must continue farming operations over the entire course of the plan to qualify for the protections of Chapter 12. A debtor who temporarily discontinues operation of the family farm, who would otherwise qualify, would also seem worthy of relief under the provisions of Chapter 12. *See also* Lawrence P. King, 2 *Collier on Bankruptcy* ¶ 101.18[4] (15th ed. rev.1998) (explaining that a debtor farming at the time of filing is eligible for Chapter 12, and

---

**6.** The court in *Buckingham* indicated the quoted material was taken from *Potmesil v. Alexandria Prod. Credit Ass'n,* 42 B.R. 731 (W.D.La.1984). *In re Buckingham,* 197 B.R. at 104. Based upon this Court's research, this text originated in *In re Tart.*

that a temporary cessation due to financial setbacks should not affect eligibility). A limited interpretation of the eligibility statute, one which requires that the debtor be actively farming on the date of bankruptcy, would seem to promote protection of that class of true family farmers who for whatever reason have interrupted their operation, but would preclude those who have permanently ceased farming from accessing Chapter 12.

In addition, a close reading of the cases relied upon in *Buckingham* further supports interpreting § 101(18) as requiring only that the debtor be engaged in farming at the time of filing in order to be eligible for Chapter 12 relief. For example, the *Buckingham* court cites its own decision in *In re Indreland,* 77 B.R. 268 (Bankr. D.Mont.1987), to support its conclusion. However, *Indreland* addressed a considerably different question: whether a Chapter 12 debtor who planned to continue farming, but at a reduced level, could fund proposed plan payments in part with non-farm income. 77 B.R. at 270. The court held that the debtor could, consistent with Chapter 12, use non-farm income to pay creditors. *Id.* at 270–71. In this sense, *Indreland* provides little support for the holding in *Buckingham,* other than its approval of the language from *Tart.* Indreland simply acknowledges that a farmer could, consistent with Chapter 12 and under appropriate circumstances, use non-farm income to fund a plan.

*Tart* dealt directly with the issue of eligibility under Chapter 12. 73 B.R. at 79. There, the debtors were disabled prior to filing for bankruptcy, had been receiving disability benefits, were only minimally engaged in farming in the year prior to the Chapter 12 filing year, were not planting or harvesting at the time of filing, and expressed their intent to permanently discontinue farming operations. *Id.* at 79, 82.

In this context, the bankruptcy court interpreted the phrase "engaged in a farming operation" in § 101(18) to require that, in addition to farming in the year prior to filing, a debtor must be engaged in farming at the time of filing.

Clearly, the facts in *Tart* justify the court's holding. However, the portion of *Tart* quoted above is not at all inconsistent with the holdings of *Clark* and *Lockard* discussed *supra.* In a footnote, the *Tart* court "decline[d] to set forth a general rule specifying the time period during which an individual must be engaged in a farming operation in order to qualify as a 'family farmer,'" and explained that "[f]or the time being, at least, each case will be decided upon its own unique facts." *Id.* at 82 n. 4. The decision in *Tart,* then, can fairly be read as holding that, depending upon the facts of each case, a debtor need only meet the statutory test for farm income in the year preceding the filing year and be engaged in farming operations at the time of filing. This Court concurs with this conclusion.

The final case cited in *Buckingham* concerning Chapter 12 eligibility is *Potmesil v. Alexandria Prod. Credit Ass'n,* 42 B.R. 731 (W.D.La.1984). *Potmesil* considered a creditor's right to file an involuntary petition against a debtor who, arguably, was protected against such a filing by the exception in 11 U.S.C. § 303(a) for "a farmer." *Id.* at 732. In applying what is now § 101(20) (defining the statutory term "farmer," not "family farmer"), the court refused to imply meaning into the statutory language, reasoning that it was only necessary to examine a debtor's status as expressly required by the statute. *Id.* The court also noted that Congress was capable of expressing specifically when it was necessary to examine a debtor's status. *Id.* at 733.

In sum, depending upon the facts of each case, the better-reasoned case law supports interpreting the phrase "engaged in a farming operation" in § 101(18) as requiring only that a debtor be farming at the time of filing. This approach is certainly preferable, in the Court's opinion, where there is an indication that a debtor has temporarily ceased farming activity during the pendency of the bankruptcy case, but intends to return to active farming operations when financially able to do so. Consistent with congressional policy that the Code assist such farmers in preserving their operations, there is no good reason to deny such individuals access to Chapter 12 relief. *Tart*, 73 B:R. at 81 (quoting Joint Explanatory Statement of the Committee of Conference, H.R. Rep. 99-958, at 48 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5246, 5249: "[Chapter 12] is designed to give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land."). The Court declines to adopt a broad, and potentially unnecessarily harsh, interpretation of the *Buckingham* decision. Rather, the Court views that decision as limited to situations in which the debtor, after filing for bankruptcy, intends to permanently abandon active family farming.[7]

Based on Mr. Nelson's testimony, while Debtors currently lack the financial resources to recommence active farming, they intend to do so as soon as possible. This evidence was not effectively contradicted. Under these circumstances, since Debtors were obviously qualified for Chapter 12 relief on the date they filed their petition, and only later discontinued their farming operation because of financial exigencies, the Court concludes Debtors are eligible for Chapter 12 relief. The Bank's objection contending otherwise is overruled.

### Conclusion

Debtors' Plan can not be confirmed because the Plan failed to clearly provide that the Bank's liens would be retained pending payment of the Bank's allowed secured claim, and because Debtors could not show the Plan was properly funded absent a firm proposal to lease their property. The Bank's objections to the proposed treatment of its allowed secured claim in Debtors' Plan, to Debtors' good faith, and to Debtors' eligibility for Chapter 12 relief, all lack merit. A separate order will be entered denying confirmation of Debtors' Plan, but allowing Debtors a modest period of time during which to file another amended plan.

### ORDER RE CONFIRMATION

For the reasons set forth in the Court's Memorandum of Decision filed herein, and for other good cause,

**IT IS HEREBY ORDERED THAT** confirmation of Debtors' Amended Chapter 12 Plan, Docket No. 56, be and is hereby **DENIED**. Debtors shall have twenty-one (21) days from the date of this order within which to file a further amended Chapter 12 plan. If they fail or decline to do so, this case will be dismissed upon advice of the Chapter 12 Trustee without further notice or hearing.

---

**7.** The Court neither adopts nor rejects the reasoning of *Buckingham* as applied to such facts, preferring to defer any such decision until an actual case is presented in the appropriate context.